**KENT et al., Appellants,**

v.

**CHESTER LABS, INC., Appellee.**

[Cite as *Kent v. Chester Labs, Inc.* (2001), 144 Ohio App.3d 587.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000569.

Decided June 29, 2001.

*Lopes, Hodes, Restaino, Milman, Skikos & Polos* and *Janet G. Abaray,* for appellants.

*Donald B. Hordes* and *Elizabeth L. Ross,* for appellee.

*Per Curiam.*

The plaintiffs-appellants, Debbie and Robert Kent, appeal from the trial court's order granting summary judgment to the defendant-appellee, Chester Labs, Inc., in an action alleging that Debbie Kent had been fired by the company in retaliation for filing a workers' compensation claim. The Kents alleged that the firing contravened both Ohio public policy and R.C. 4123.90, which specifically prohibits the retaliatory dismissal of an employee who has filed for workers' compensation. In their two assignments of error, the Kents allege that the trial court erred by (1) applying an erroneous legal standard to determine whether

there was a prima facie case of retaliatory discharge in violation of R.C. 4123.90, and (2) failing to properly analyze whether the discharge was in violation of Ohio public policy. For the reasons that follow, we reverse and remand.

## FACTS

Debbie Kent went to work for Chester Labs in January 1995 as a production worker. After a few years, she was appointed to line leader due to her job performance. In April 1997, Kent sustained a back injury while working on the line. Dr. Andrew Roth, an orthopedic specialist, diagnosed the injury as a severe lumbar strain, and Kent was awarded workers' compensation benefits as a result. Kent testified that the injury continued to be symptomatic and required a regimen of stretching and flexibility exercises.

According to Kent, the injury flared up at work on Friday, December 18, 1998, when she noticed pain and tightness emanating from her back. Kent testified that, during the week leading up to that Friday, Chester Labs had been trying to get out a "double batch" of product, and that she and her co-workers had been "pushing it, pushing it" on the line. She further testified that on Saturday morning she had the same symptoms. Later in the day, while helping her husband on his rack route for the Cincinnati Enquirer, Kent lifted a bundle of inserts and felt her back "go out." She testified that she spent the rest of the weekend staying in bed and treating her back with ice. On Monday, December 21, 1998, Kent informed Chester Labs that she would not be at work and then went to see her physician. Dr. Brian Smith, an associate, examined her back and diagnosed severe lumbar strain. The cost of the examination was paid by Kent's insurance and not included in a workers' compensation claim.

Kent took several days off from work, returning on December 28, 1998. She testified that upon her return she did not have any discussion with her two supervisors, Madge Ortwein and Kay Erdman, about filing a workers' compensation claim. She denied recalling any conversation in which she had told a co-worker that she planned to injure herself on the job. She testified that Ortwein had told her to "try and take it easy."

On January 4, 1999, Chester Labs was again trying to get out a "double batch." Kent described her two co-workers on that day as not being particularly productive, since one of the workers, Kimberly Willin, was new and the other, Tracy Napier, spent more time talking. She testified that she saw a case that needed to be lifted off the line and put on a skid, so she lifted it herself. While doing this, she testified, she felt a sharp stabbing pain down her back and dropped the case. Kent then went to Erdman's office, where, she testified, Erdman immediately told her, "I can tell you right now, this is not a Workmen's

Comp claim." According to Kent, Erdman "repeated that several times and she told me, do not pursue it that way."

Kent then drove herself home. Later, Kent called the Bureau of Workers' Compensation and was told that the new injury could be an aggravation of her previous work-related back injury. Kent was advised, therefore, to have herself examined again by Dr. Roth. Dr. Roth obtained a history from Kent that included the incident involving her lifting of "a bale of Saturday newspapers" and the subsequent worsening of her symptoms. Dr. Roth diagnosed a herniated disk and lumbar strain. Upon deposition, Dr. Roth testified that, in his opinion, Kent's back injury in January 1999 was "related to an injury from work" and essentially the same as the one she had experienced in 1997.

Kent filed a workers' compensation claim, which was ultimately denied. She was not released to go back to work. According to Kent, on February 12, 1999, she received a telephone call from Erdman essentially summoning her to come to Chester Labs for a meeting. When she arrived, Erdman told her that she was being terminated for employee dishonesty because the company did not believe that she had been injured at work.

In its motion for summary judgment, Chester Labs presented the deposition of Willin, who testified that Kent's back injury on January 4, 1999 "was fake as fake could be." She stated that Kent "went to the ground" with the case, with her hands still on it, and never did, in fact, drop it. Willin testified that in an earlier conversation Kent had expressed her disagreement with her doctor's opinion that she was ready to come back to work. Willin testified, "She [Kent] says, so I guess I'll have to go in there and rehurt myself, is exactly what she said." Willin reported the statement, which she characterized as one made in frustration, to Ortwein and Erdman.

Chester Labs also presented the deposition of Erdman, the company's Human Resources Director, who described Kent as a good employee with regular attendance and no disciplinary problems. She testified that at an office Christmas party on December 21, 1998, she spoke to Kent (who was still not back at work) and asked her how she had hurt her back. Kent responded by telling her about the incident with the newspapers occurring over the previous weekend. Erdman confirmed that Kent was in obvious discomfort from back pain.

Erdman testified that on January 4, 1999, Ortwein had called her earlier in the morning to report that Kent was inquiring whether she could submit her most recent back injury as a workers' compensation claim. She testified that she found it suspicious, therefore, when Kent later came to her office, claiming to have reinjured herself. Afterward she interviewed Willin and Napier. Erdman stated that Napier and Willin differed on whether Kent had actually dropped the case—one woman claimed that she had dropped it, and the other claimed that she

had placed it on the floor. She testified that as part of her investigation she did not review Dr. Roth's subsequent medical report in which he had diagnosed a herniated disk, nor did she make any attempt to have the company formulate an opinion on the legitimacy of Kent's injury on the basis of medical data. She did not personally discuss Kent's condition with Dr. Roth, nor did she believe that anyone else in the company had pursued such a discussion. She testified, in fact, that she was not really concerned with whether Kent had actually reinjured her back on January 4, 1999: "I don't know whether she did [sustain an injury on that date] or whether she didn't." In Erdman's view, even if it was genuine, Kent's injury on January 4, 1999, was "premeditated." She testified that ultimately her decision that Kent should be fired was based upon her belief that Kent was trying to deceptively receive workers' compensation benefits for an injury that she had first sustained while she was helping her husband with his paper route. Erdman stated:

"The determining factor [in Kent's firing] was that she had spoken about it to other employees, had led them to believe that that's what she was going to do.

"I conferred with the owner of the company, with the vice president of manufacturing, and with counsel. And, jointly, we decided that this was not a message that we wanted to send to the other employees, and that's why she was terminated."

Chester Labs also presented the deposition of Ortwein, who was a supervisor at the company during this period. She, too, described Kent as a good, reliable worker with whom she never had a conflict. She testified that when she first saw Kent on the morning of January 4, 1999, Kent's back appeared to be still bothering her. After inquiring about her back, Ortwein testified, she told Kent to "take it easy" and "not to be lifting anything heavy or anything like that." Ortwein stated that Kent then asked her whether she could "turn her back into Workmen's Comp," and that she, Ortwein, advised her to discuss the matter with Erdman in Human Resources. She testified that when she saw Kent after her alleged injury, she was holding her back and appeared to be in pain. Ortwein stated that, in her opinion, it was poor judgment for Kent to have lifted the case off the line when other employees were present to whom Kent, as line leader, could have delegated the task.

## FIRST ASSIGNMENT OF ERROR

In her first assignment of error, the Kents raise several issues in arguing that the trial court erred in granting summary judgment to Chester Labs on their claim of retaliatory discharge. Initially, they argue that the standard that this court articulated in *Boyd v. Winton Hills Med. & Health Ctr., Inc.* (1999), 133 Ohio App.3d 150, 727 N.E.2d 137, for establishing a prima facie case of retaliatory

discharge—the standard applied by the trial court—is wrong. Second, they argue that the trial court misapplied this standard. Finally, they argue that the trial court failed to grant them the benefit of all reasonable inferences from the evidence, as required by Civ.R. 56(C).

R.C. 4123.90 specifically prohibits an employer from discharging an employee as punishment for filing a workers' compensation claim. In *Boyd*, we held:

"To prove a violation of R.C. 4123.90, the employee must set forth a prima facie case of retaliatory discharge. The employee must show that he or she was 'injured on the job, filed a claim for workers' compensation, and was discharged by the employer in contravention of R.C. 4123.90.' If the employee establishes a prima facie case, then the employer must set forth a legitimate nonretaliatory reason for the discharge. Finally, if the employer provides a nonretaliatory reason, the employee must prove that the reason was pretextual." (Footnote omitted.) *Id.* at 154, 727 N.E.2d at 140, quoting *Wilson v. Riverside Hosp.* (1985), 18 Ohio St.3d 8, 18 OBR 6, 479 N.E.2d 275, syllabus.

The Kents argue that this court's articulation of the elements of a prima facie case denies a plaintiff "the benefit of an inference of retaliation." Specifically, they argue that the third prong or element, requiring the plaintiff to show that she was discharged "in contravention of R.C. 4123.90," requires that the plaintiff prove her case in order to get the benefit of a prima facie case. Such a requirement, they argue, is totally at odds with the normal burden-shifting paradigm in discrimination cases, in which a presumption or inference of discrimination arises without the necessity for direct proof. See, *e.g., McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.

 While the Kents' argument does not lack merit, we observe that our language in *Boyd* was not intended to require the plaintiff to present a "smoking gun" in order to withstand summary judgment on a claim of retaliatory dismissal. The requirement that a plaintiff show that he or she was discharged in contravention of R.C. 4123.90 may be satisfied by circumstantial as well as direct proof. As we noted in *Boyd*, "The factors that a trier of fact may consider in determining whether there was a retaliation include 'punitive action such as bad performance reports after the * * * claim was filed, the length of time between the claim and the discharge, changes in salary level, hostile attitudes emerging, and whether legitimate reasons exist for the discharge.' " (Footnote omitted.) *Id.*, quoting *Anschutz v. Dresser Industries Inc.* (Dec. 11, 1991), Crawford App. No. 3–90–8, unreported, 1991 WL 261828.

 In granting summary judgment to Chester Labs, the trial court characterized the Kents' claim of retaliatory discharge as resting upon "[s]peculation and unfounded assertions." Further, the court observed that the Kents had not

produced evidence of a pattern of retaliation, nor had they proved that Debbie Kent was discharged "for *the sole reason* of pursuing a workers' compensation claim" (emphasis *sic*). Having reviewed the record, however, we conclude that the evidence, when viewed in the light most favorable to the Kents, was sufficient to create a question of fact whether Debbie Kent was terminated in retaliation for her filing of a workers' compensation claim.

There certainly can be no doubt that Kent's attempt to treat her January 4, 1999 back injury as a workers' compensation claim caused her firing. Chester Labs does not dispute this. Chester Labs argues, however, that its motivation was not the claim itself, but its belief that Kent was dishonestly trying to represent her back injury as work-related, when, in fact, the injury stemmed from a lumbar strain that she had suffered while helping her husband over the weekend of December 18–20. Erdman's deposition makes clear, however, that the company reached such a damaging conclusion to Kent without even considering the medical opinion of her orthopedist that she had, in fact, suffered a new work-related injury (a herniated disk) on January 4, and without the support of any contrary medical opinion. Indeed, according to Erdman, the company acted upon the assumption that even if Kent had actually suffered an injury while lifting a case off the line on January 4, she had done so deliberately, and therefore the company felt no compulsion to ever examine the medical merits of her most recent claim. The company's position, further, appears to have been based solely on two factors of debatable probity: first, a passing remark to a co-worker, who admitted that Kent had spoken out of frustration, and which, Kent testified, she could not remember ever making; second, Kent's coincidental inquiry, on the date of her injury, concerning the possibility of treating her recent back troubles as grounds for a workers' compensation claim—an inquiry with some legitimate basis given Kent's position that her back had never fully recovered from the 1997 work-related injury. It is also significant that the company took this position against an employee whom it had described as always being a good, responsible, reliable worker.

Giving the Kents the benefit of all reasonable inferences, as required for the party facing a motion for summary judgment, we hold that there was evidence upon which the trier of fact could have reasonably inferred that Chester Labs had acted in a retaliatory manner and that Kent was, in fact, fired for filing a workers' compensation claim against the company's stated wishes. It must be remembered, in this regard, that Kent testified that Erdman had repeatedly told her not to submit her January 4 injury as a workers' compensation claim. Our holding is consistent with the language in *Boyd* that the trier of fact may consider evidence of "hostile attitudes emerging, and whether legitimate reasons exist for the discharge" as factors to determine whether there was retaliation.

The Kents' first assignment of error is, therefore, well taken.

## SECOND ASSIGNMENT OF ERROR

■ In their second assignment of error, the Kents argue that the trial court erred in granting summary judgment to Chester Labs on their claim that the company violated Ohio public policy by firing Debbie Kent for filing a workers' compensation claim.

■ In *Boyd*, this court, relying on *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 677 N.E.2d 308, held that "Ohio law allows common-law wrongful-discharge claims for violations of R.C. 4123.90." *Boyd*, 133 Ohio App.3d at 161, 727 N.E.2d at 145. Such common-law causes of action include a cause of action for termination in violation of public policy. *Id.* at 159–161, 727 N.E.2d at 143–145. As we pointed out in *Boyd*, a common-law wrongful-discharge claim allows remedies that are not included under R.C. 4123.90, such as punitive damages, and also confers upon the plaintiff a right to a jury trial. *Id.* at 161, 727 N.E.2d at 145.

Here, the trial court did not separately address the Kents' public-policy claim, subsuming it within its discussion of the statutory claim. Based upon our discussion under the first assignment of error, we hold that the Kents' public-policy claim remains viable, and therefore sustain the second assignment of error as well.

Accordingly, the judgment of the trial court is reversed, and this cause is remanded for further proceedings in accordance with law.

*Judgment reversed*
*and cause remanded.*

GORMAN, P.J., WINKLER and SHANNON, JJ., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.