DECISION.
{¶ 1} Plaintiff-appellant Mary Louise Doss appeals the dismissal of her retaliatory-discharge claim against her employer of twenty-three years. Doss claimed that she had been fired because she had filed workers' compensation claims. Finding insufficient evidence of retaliation, the trial court granted summary judgment in favor of defendants-appellees Hilltop Rental Company and Summit View Properties. We affirm.
 I. Workers' Compensation Claims and a Firing {¶ 2} Doss worked as a cleaner for Hilltop and Summit View's two apartment complexes from 1978 until April 2001. Doss's job responsibilities included cleaning vacant and model apartments and common areas at the complexes. Though at times the cleaning team numbered as many as six workers, at the time of her dismissal, the cleaning team consisted of Doss and her sister, Ruby Walker. For the last six years of her employment, Doss's supervisor was Colleen Lawrence.
 {¶ 3} Doss filed several different workers' compensation claims during her employment. The first filing was in 1995, when Doss suffered injuries to her back and right shoulder in an elevator accident. Doss next filed a claim in 1997, when she developed carpel tunnel syndrome in both hands. She required surgery on one hand in 1997 and on the other in 1998. In 2000, Doss filed another workers' compensation claim when she fell off a ladder while cleaning an apartment. She injured her left shoulder, back, and neck, aggravating her prior injuries from the 1995 accident.
 {¶ 4} Despite the surgeries on her hands for her carpel tunnel syndrome, in 2000, Doss again began experiencing numbness and other symptoms in her hands. Doctors recommended that she have additional surgery, but Doss opted for physical therapy to address the problem.
 {¶ 5} On April 20, 2001, Doss arrived at work and received her work order for the day from Lawrence. The work order included cleaning caulk off windows at one of the apartment complexes and carrying outlet switch covers to replace any missing in the apartments.
 {¶ 6} The order to clean the caulk upset Doss, because Lawrence had previously told Doss and Walker not to worry about the caulk on the windows, due to the possibility of litigation with the window installer. The order to carry the switch plate covers also upset Doss, because she felt that that was something maintenance personnel typically took care of. In a heated exchange, Doss expressed her unhappiness to Lawrence, and Lawrence said that she would get somebody else to clean the caulking.
 {¶ 7} Doss headed off to begin other cleaning, but Lawrence followed her, not wanting to leave things unresolved. Lawrence testified that Doss began complaining about other employees and making negative comments about her job. Lawrence testified that Doss told her that "I was adding extra work. That she couldn't do it all. That her body hurts at the end of the day and I keep pushing her to do more."
 {¶ 8} Lawrence said to Doss that she did not realize Doss felt as she did, adding, "You shouldn't be working here if you have these feelings." Doss accused Lawrence of trying to provoke her into quitting and wanting to get rid of her due to her workers' compensation claims. Doss told her that she would not quit and that Lawrence would have to fire her. Lawrence responded by firing Doss, and she testified that she felt that that was what Doss had wanted her to do.
 II. Summary-Judgment and Retaliatory-Discharge Standards {¶ 9} In her two assignments of error, Doss argues that the trial court erred in granting summary judgment on her workers'-compensation-retaliation claim and on her public-policy claim. We review a grant of summary judgment de novo.[1] Hilltop and Summit View were entitled to prevail on their summary-judgment motion only if (1) there was no genuine issue of material fact; (2) they were entitled to judgment as a matter of law; and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in favor of Doss, and that conclusion was adverse to Doss.[2]
 {¶ 10} Under R.C. 4123.90, it is illegal for an employer to retaliate against an employee for filing or pursuing a claim for workers' compensation benefits: "No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer."[3]
 {¶ 11} To establish a prima facie case of retaliatory discharge under the statute, the employee must show that he or she "was injured on the job, filed a claim for workers' compensation, and was discharged by that employer in contravention of R.C. 4123.90."[4] If the employee establishes a prima facie case, then the employer must set forth a legitimate nonretaliatory reason for the discharge.[5] Finally, if the employer provides a nonretaliatory reason, the employee must prove that the reason was pretextual.[6]
 {¶ 12} Hilltop and Summit View agree with Doss that the first two prongs for a prima facie case were established in the trial court — that Doss was injured on the job and filed workers' compensation claims. But Doss argues that the trial court erred when it did not find facts supporting the existence of the third prong — that she was firedbecause of her workers' compensation filings.
 {¶ 13} Ohio and other states with similar statutes use a flexible evidentiary test for purposes of assessing retaliatory behavior.[7]
Most courts look at the "before and after" picture.[8] "Factors taken into consideration include such punitive action as bad performance reports surfacing immediately after a workers' compensation claim was filed, the length of time between the filing of a claim and discharge, changes in salary level, hostile attitudes emerging, and whether legitimate reasons exist for the discharge."[9] The burden of proving that the employer had a retaliatory motive remains at all times on the employee.[10]
 III. Doss Failed to Establish Hostile Attitudes {¶ 14} To prove that her firing was based on retaliation, Doss offered facts to show that she faced a hostile attitude from her supervisor after she filed her carpel-tunnel-syndrome claim. Specifically, she cited instances of "nit-picking," inconsideration, and changes in work assignments.
 {¶ 15} In her deposition, Doss testified that she and Lawrence had a "good relationship, working and personal," before Doss's carpel-tunnel-syndrome surgery, but that, after the surgery, Lawrence's attitude towards Doss changed. Doss testified, "She wasn't considerate, and she was nitpicking me on my work and just finding fault with stuff." Asked to cite specific examples of the nitpicking, Doss said that, three or four times, Lawrence inspected an apartment after Doss and Walker had finished cleaning and requested that they go back and clean the cracks in the light-switch plates with a toothbrush. Both workers had to return and finish cleaning the light-switch plates, which Doss acknowledged were still dirty.
 {¶ 16} Doss claimed that, after her surgery, Lawrence did not show consideration and concern for the cleaners. At one point, Lawrence asked Doss and the other cleaner to clean the heat lines in the apartments. The cleaners did as they were asked, but became sick and got headaches from the chemical that they were using to clean the coils. Doss and the other cleaner eventually took the chemical to Lawrence and said the chemical was dangerous and that they needed more ventilation to use it. Doss said that Lawrence was not happy that they had complained about it, but that she did obtain a different chemical for them to use.
 {¶ 17} On another instance, Charlie Barnett, the maintenance supervisor, was supervising the cleaners, as he did whenever Lawrence was unavailable or on vacation. Barnett ordered Doss and Walker to clean an apartment at the same time that a contractor was in the apartment reglazing the bathtub. The cleaners had previously been told by contractors not to be in the apartments when the tubs were reglazed, as the chemicals they used were dangerous. The contractors themselves would don masks and a complete chemical suit when they reglazed the tubs. But Barnett screamed at the cleaners and told them that they could not leave the apartment until the work was done.
 {¶ 18} Doss refused to do as Barnett ordered, and, as she was not feeling well anyway, went home. Walker and another worker cleaned the apartment, but both left before the contractor reglazed the tub. When Lawrence returned to work, she called Doss at home. Lawrence asked how Doss was feeling and apologized for Barnett's behavior. Doss said, "[S]he told me to take care of myself and get some rest and she would see me the next day."
 {¶ 19} We are not convinced that any of the instances cited by Doss showed that a hostile attitude had emerged from Lawrence towards Doss after Doss had filed her carpel-tunnel-syndrome workers' compensation claim. The "nitpicking" example that Doss cited applied to both Doss and another worker, and Doss herself acknowledged that the light-switch plates could have been cleaned better. When Lawrence was told that the chemical the cleaners were using to clean the heating coils was dangerous and was causing them to become sick, she obtained a different chemical for them to use. And Lawrence was not even present or involved with the incident when Barnett ordered Doss and Walker to clean an apartment while a tub was being reglazed. Upon learning what had happened, Lawrence phoned Doss, apologized, and made sure that she was returning to work the next day. That was clearly not the behavior of a supervisor eager to dismiss a troublesome employee.
 {¶ 20} In addition to nitpicking and inconsideration by Lawrence, Doss claimed that the cleaners were assigned new tasks that they were not required to do before her surgeries.
 {¶ 21} One day, the cleaners were instructed to clean the bathroom sink stoppers. Barnett was instructed to show them how to take the stoppers apart, and Doss testified that, with her carpel tunnel syndrome, she would not have been able to do it. When Barnett attempted to demonstrate how to get to a stopper to clean it, he had difficulty taking it apart and then could not put it back together without it leaking. Both he and the cleaners told Lawrence that it was not a good idea to have the cleaners be responsible for cleaning the sink stoppers. After that, Doss and Walker did not clean the stoppers as part of their regular duties, and Lawrence never said anything about it to either of them. We fail to see how the request to clean the sink stoppers, which Doss and Walker never did and for which they suffered no consequences, demonstrated a hostile attitude from Doss's supervisor.
 {¶ 22} Doss also believed that the assignment to clean the caulk off the windows, which led to the confrontation between Lawrence and Doss and Doss's firing, was an example of Lawrence creating a hostile environment. Doss claimed that she was told repeatedly that she did not need to clean the windows because of possible litigation with the window installers. But, according to Doss, once Lawrence's attitude towards her changed, Lawrence assigned Doss to clean the windows.
 {¶ 23} First, it should be noted that when Doss became upset about cleaning the windows on the morning she was fired, Lawrence expressed annoyance, but told Doss she would get somebody else to clean them. Second, in Lawrence's deposition, she explained that the windows had been installed incorrectly. Summit View eventually settled with the window installers for the faulty work, and, at that point, Summit View handled the repair and cleaning of the windows. On Doss's last day of work, an apartment that had one of the caulked windows needed cleaning, and Lawrence assigned Doss to do it.
 {¶ 24} Construing all the facts cited in Doss's favor, we conclude that there was little or no evidence supporting her claim that she was subjected to a hostile attitude after filing her workers' compensation claims, or that she was fired because she filed the claims. There was at times tension between the cleaners and their supervisors. But the examples cited by Doss did not show that the tension existed because of her workers' compensation claims, or that she was fired because of the claims.
 IV. Comments About Health {¶ 25} More supportive of Doss's argument that her firing was retaliatory were statements made by Lawrence concerning Doss's workers' compensation claims and Doss's health issues. Doss claimed that Lawrence would become upset when Doss had to attend doctors' appointments or workers' compensation hearings. One day, upon learning that Doss had a workers' compensation hearing that day, Lawrence confronted Doss and asked, "[N]ow, what's this one about?" Doss replied that she was not sure. Doss testified that Lawrence said, "[W]ell, I just think they're pushing this stuff a little too far[,]" and that she thought it was ridiculous.
 {¶ 26} On other occasions, Lawrence questioned Doss's use of chiropractors, saying she did not believe in them and did not think they could help Doss. And when Doss's doctors told her that her carpel tunnel syndrome had returned and that she needed surgery again, Lawrence stated that she thought that was ridiculous. She asked Doss if she was going to have the surgery again and stated that she thought that it would be silly to have surgery again if the carpel tunnel syndrome had returned so soon.
 {¶ 27} Kim Smith, an office worker for Summit View, stated in an affidavit that she had overheard Lawrence complain about Doss's workers' compensation claim for carpel tunnel syndrome. She specifically recalled that Lawrence was angry about Summit View having to pay a large bill for treatment of Doss's injury. According to Smith, Lawrence expressed unhappiness about the length of time that Doss had been receiving workers' compensation benefits for her carpel tunnel syndrome. Smith stated, "Lawrence said something like `you would think that after two surgeries you wouldn't have to have anymore workers' compensation and that these problems would have been taken care of.'"
 {¶ 28} Construed in Doss's favor, Lawrence's comments could have supported the theory that Lawrence was growing frustrated over Doss's seemingly never-ending health issues and was growing concerned about the expense and time involved for Hilltop and Summit View. But the comments did not show that Lawrence's frustration with Doss's ongoing workers' compensation claims created a hostile attitude that ultimately led to Doss's firing.
 {¶ 29} In Boyd v. Winton Hills Medical and Health Center,Inc.,[11] we held that a single comment by an employer could be enough to create an inference that the employer had some hostility towards an employee. But, in Boyd, the employer had stated, "He filed that Workman's Comp[.] claim; I want him out of here."[12] In another case where the court held that the employee had presented a prima facie case of retaliation, a supervisor had told the employee, "You are screwing us. Workers compensation costs us a lot of money, and that's money that we don't have to give you raises. I'm going to snap you out of this. If I give you work, you gotta do it."[13] In yet another case where the court ruled in the employee's favor and found evidence of retaliation, as soon as the employee had hurt her back, the supervisor said, "I can tell you right now, this is not a Workmen's Comp claim."[14]
 {¶ 30} We note that none of Lawrence's comments contained any threat to Doss's employment. Doss admitted that Lawrence had never told her not to have the second surgery for her carpel tunnel syndrome. Lawrence also never told Doss not to file a workers' compensation claim or to drop a workers' compensation claim that had already been filed. Most importantly, unlike the foregoing cases, Lawrence never connected any of her comments about Doss's health or workers' compensation benefits to a threat to end Doss's employment.
 {¶ 31} Lawrence testified that she had fired Doss because she felt that Doss wanted to be fired. Doss testified that a number of workers at Summit View had voiced concerns about how long Doss could continue to do the hard work of a cleaner. She testified that Barnett had said that maybe she was getting too old to do the job. Lawrence also asked Doss several times how much longer she could do the job and said that Doss herself complained that she was getting too old to do the work. Lawrence testified that Doss had told her daughters that she did not know how much longer she could do her job.
 {¶ 32} Lawrence said, "Now we talked a lot at the end of the day and some days her eyes would tell the pain that she was in. * * * [S]he didn't know how much longer the pain would be — that it could get to the point that she couldn't take the pain and do the job."
 {¶ 33} Doss testified that when Lawrence asked her how long she could continue doing such hard work, she said, "[I]t's hard with all my problems with my workman's comp, but I'm trying to hang in here until I can retire at 62 at least. * * * I just knew I had to hang in there. I had to support myself. I couldn't be a burden on my children." (Doss was 57 when she was fired). Nonetheless, Doss admitted, "Since I fell off the ladder I was really struggling."
 {¶ 34} Doss could prevail on her claim under R.C. 4123.90 only if she alleged and proved that she was fired not because of her job-related injuries, but because of her pursuit of the workers' compensation benefits awarded as a result of those injuries.[15] We conclude that the comments by Lawrence concerning Doss's health issues and ongoing workers' compensation claims did not sufficiently show a causal relationship between Doss's workers' compensation claims and her firing.
 {¶ 35} "Not every action taken by an employer that has a disadvantageous or detrimental effect upon an employee is a `punitive action' within the meaning of the statute. To hold otherwise would effectively preserve the status quo of every employee receiving benefits for job-related injuries, regardless of future job performance."[16]
Construing the facts in Doss's favor, we hold that the evidence was insufficient to support her theory that a hostile attitude had emerged after she had filed her workers' compensation claims or that Lawrence had fired her because she had filed the claims.
 V. Other Factors {¶ 36} In addition to Doss's failure to establish that she had endured hostile attitudes at work because of her filing of workers' compensation claims, the other relevant factors bearing upon whether her dismissal was retaliatory did not favor Doss. In her argument, Doss focused on the factor of whether there was a hostile attitude towards her after the filing of her workers' compensation claims. But we must also consider Doss's performance reports after her claims were filed, the length of time between the claims and the firing, any changes in salary level, and whether legitimate reasons existed for her discharge.
 {¶ 37} Doss presented no evidence that she had ever received a bad performance report after any of her workers' compensation claims were filed. In fact, Doss testified that several times she had been awarded "Employee of the Month" honors. The only specific date that she could remember for the award was September 1999, which was after Doss had filed the workers' compensation claims for her elevator accident and both hand surgeries.
 {¶ 38} In considering the length of time between the filing of the workers' compensation claims and the discharge, we note that Doss originally filed a workers' compensation claim in 1995, six years before she was fired. The last claim she actually filed was in March 2000, and she was not fired until April 2001. This factor suggests that Doss's firing was unrelated to her workers' compensation claims.
 {¶ 39} But Doss argues that her firing came within two months of when she had told Lawrence that her doctor had recommended additional surgery for her carpel tunnel syndrome. And the most questionable comments made by Lawrence were in response to learning that Doss might need to have further surgery both her comments to Doss that she thought further surgery was ridiculous and her comments overheard by Smith expressing unhappiness over the length of time Doss was receiving workers' compensation benefits for her carpel tunnel syndrome. Looked at in this way, the factor of the length of time between the claims and the firing could support Doss's argument that her firing was related to her extended health issues and the prolonged workers' compensation claims.
 {¶ 40} The next factor concerns any changes in salary level. Doss testified that at the beginning of 2001, about nine months after her last workers' compensation filing, she had received an increase in salary of 5%, from $9.85 an hour to $10.35 an hour. Also, Doss's reduced rate on her apartment at Summit View, where she paid only $125 a month, stayed the same, even though the normal rental rate for her apartment had increased.
 {¶ 41} In addition, Doss received several unsolicited bonuses from Lawrence. Doss testified that she had received a bonus of $250 when she had helped to fill in for another worker. Doss could not remember the date, but thought that it was several years before she was fired. In October 2000, Lawrence gave Doss a bonus of $250 before Doss went on vacation. Doss said that she had received it for "all the hard work I had done and getting all the apartments done and ready on time." And a few weeks before she was fired, Doss's paycheck was about $37 too much because an insurance payment had mistakenly not been deducted. Lawrence told Doss just to consider it a bonus. The salary increase and the bonuses clearly indicated a good working relationship between Lawrence and Doss. They also showed that Lawrence appreciated Doss's efforts at work.
 {¶ 42} Perhaps most damaging to Doss's claim of a retaliatory discharge was that Lawrence repeatedly offered other employment opportunities to Doss.
 {¶ 43} Within the last year and a half of Doss's employment, Lawrence offered Doss a job in the rental office. Instead of the repetitive manual labor of cleaning apartments, Doss was offered a job leasing apartments to new residents. Lawrence also suggested that, in time, Doss could take over the office manager's job. Doss declined the offer because she did not think that she had the skills to do the work. Lawrence encouraged her nonetheless, saying that she could learn the necessary skills. Lawrence said that if her daughter, a high-school student, could do it, she knew Doss could do it. But Doss did not accept the offer.
 {¶ 44} Asked how Lawrence responded when she turned the job down, Doss said, "She wasn't very happy about it. She said she had spent a lot of time thinking about it and working on it and stuff. And I guess she thought I would take it, but I didn't."
 {¶ 45} Later, within the last year of her employment, Lawrence offered Doss the job of resident manager of one of the apartment complexes. Lawrence specifically presented the job offer as something that would be physically easier for Doss to do. The work would not have been manual labor, and Doss would have lived at the site rent-free and leased the apartments to other tenants. Again Doss declined the offer. She did not consider the new job full-time work and was concerned that she would still be required to do some cleaning. In addition, Doss said that it involved paperwork and worried that she would not be able to do the work.
 {¶ 46} Doss turned down both job offers, even though she admitted that they would have been promotions. Doss felt that, with her limited education, she was unqualified for either job and preferred to remain working as a cleaner.
 {¶ 47} And finally there was significant evidence that Doss and Lawrence had a good relationship, both professional and personal, up until the day Doss was fired. Doss herself testified that, the day before she was fired, she had been laughing and joking with Lawrence. Walker, Doss's sister, testified that the friendship between Doss and Lawrence did not cease at any time during Doss's employment. According to Walker, "Mary Lou always went upstairs and they were always talking about somebody in [Lawrence's] family or somebody in Mary Lou's — grandkids or daughter, they were always talking about stuff together."
 {¶ 48} When construing all the facts in Doss's favor, we hold that there were very few facts that supported her claim of retaliatory discharge. Lawrence expressed frustration and general negativity towards Doss after Doss had said that she might need further surgery for her carpel tunnel syndrome. Lawrence sometimes acted annoyed or frustrated at Doss's many workers' compensation hearings and medical appointments. Lawrence expressed doubt about whether additional surgery and the medical care Doss was receiving were even necessary. Lawrence also questioned Doss's ability to continue the demanding physical work of cleaning apartments. The timing of Doss's firing was within several months of when she had revealed that she might require further surgery for her carpel tunnel syndrome.
 {¶ 49} Taken as a whole, the evidence was insufficient to make a prima facie case that Doss's firing was in retaliation for her workers' compensation claims. Based on the evidence, the only conclusion reasonable minds could reach was that while Doss had struggled with her health and had filed numerous workers' compensation claims, sometimes frustrating her employer, she had not been fired because she had filed the workers' compensation claims.
 {¶ 50} Therefore, we overrule Doss's first assignment of error and hold that summary judgment was properly granted against Doss on her claim of retaliatory discharge.
 VI. Public-Policy Claim {¶ 51} In her second assignment of error, Doss argues that the trial court improperly dismissed her claim of wrongful discharge in violation of public policy.
 {¶ 52} We have previously held that an employee has a cause of action for termination in violation of public policy based on an employer's violations of R.C. 4123.90.[17] But for Doss to have succeeded on a public-policy claim based on R.C. 4123.90, she had to comply with the requirements of the statute.[18] Because we have determined that Doss failed to establish that she had been fired in retaliation for her workers' compensation claims, her common-law claim based on public policy also failed and was properly dismissed.
 {¶ 53} Accordingly, we overrule Doss's second assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Sundermann, P.J., and Hildebrandt, J., concur.
[1] See Doe v. Shaffer, 90 Ohio St.3d 388, 390, 2000-Ohio-186,738 N.E.2d 1243.
[2] See Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105,1996-Ohio-336, 671 N.E.2d 241.
[3] R.C. 4123.90.
[4] See Wilson v. Riverside Hospital (1985), 18 Ohio St.3d 8,479 N.E.2d 275, syllabus.
[5] See Boyd v. Winton Hills Medical and Health Center (1999),133 Ohio App.3d 150, 154, 727 N.E.2d 137.
[6] Id.
[7] See Hohn v. Deco Tools, Inc. (Jan. 23, 1987), 6th Dist. No. L-86-119.
[8] Id.
[9] Id. See, also, Boyd v. Winton Hills Medical and Health Center, supra, at 154, and Anschutz v. Dresser Industries, Inc. (Dec. 11, 1991), 3rd Dist. No. 3-90-8.
[10] See Boyd v. Winton Hills Medical and Health Center, supra, at 154.
[11] Supra, at 155-156.
[12] Id. at 155.
[13] See Limbacher v. Penn-Ohio Coal Co., 5th Dist. No. 2001 AP 07 0065, 2002-Ohio-2870.
[14] See Kent v. Chester Labs, Inc. (2001), 144 Ohio App.3d 587,589-590, 761 N.E.2d 60.
[15] See Bea v. Revlon Realistic Professional Products, Inc. (Nov. 27, 1985), 1st Dist. No. C-840926.
[16] Id.
[17] See Boyd v. Winton Hills Medical and Health Center, Inc., supra, at 161.
[18] See Kulch v. Structural Fibers, Inc., 78 Ohio St.3d 134,1997-Ohio-219, 677 N.E.2d 308, paragraph three of the syllabus; Celestev. Wiseco Piston, 151 Ohio App.3d 554, 2003-Ohio-703, 784 N.E.2d 1198, at ¶ 24.