DECISION.
{¶ 1} Defendant-appellant Ampam Commercial Midwest appeals the trial court's judgment in favor of its former employee, plaintiff-appellee Timothy C. Buehler. *Page 2 
 {¶ 2} Buehler was fired by Ampam in 2002 shortly after the parties were notified that Buehler's workplace injury entitled him to total temporary disability ("TTD") compensation and that Buehler had been approved for a fusion spinal surgery related to the injury. Buehler claimed that the firing contravened R.C. 4123.90, which specifically prohibits the retaliatory discharge of an employee who has filed for workers' compensation. In additional to a statutory claim for reinstatement and back pay under R.C. 4123.90, Buehler pursued two common-law wrongful-discharge claims against Ampam. He alleged (1) that the firing violated the public policy of Ohio as embodied in R.C.4123.90 because it was retaliatory ("the retaliation-based public-policy claim"), and (2) that it violated the public policy of Ohio as articulated in Coolidge v. Riverdale Local School Dist ("theCoolidge-based public-policy claim").[1] In Coolidge, the Ohio Supreme Court held that the public policy embodied in sections 4123.90 and4123.56 of the Ohio Workers' Compensation Act protects an employee who is receiving TTD compensation from more than just a retaliatory discharge. Specifically, the Coolidge court held that public policy prevents such an employee from being "discharged solely on the basis of absenteeism or inability to work, when the absence or inability to work is directly related to an allowed condition."[2]
 {¶ 3} Buehler successfully tried his common-law public-policy claims before a jury. The jury awarded him $187,000 in damages, including a $5000 award for punitive damages, and recommended an award of attorney fees. The trial court entered a judgment in favor of Buehler on the statutory retaliation claim. After a hearing, the court awarded Buehler $85,671.50 in attorney fees and costs.
 The Facts *Page 3 {¶ 4} Buehler began his at-will employment at Ampam in 1994. As a superintendent, he was a productive employee with a positive employment and safety record. In April 2002, Buehler suffered a work-related injury to his lower back and soon after filed a workers' compensation claim. The Bureau of Workers' Compensation ("BWC") allowed the claim for lumbosacral sprain. Buehler did not claim, and the BWC did not award, TTD compensation at that point.
 {¶ 5} After Buehler's condition failed to improve, he consulted with Dr. Alfred Kahn, who diagnosed the aggravation of preexisting degenerative conditions in his lumbar spine from the April 2002 injury. Kahn recommended spinal fusion surgery and instructed Buehler not to work at all, including light duties. Buehler amended his workers' compensation claim to add the new condition as well as a request for TTD compensation. The amendment and the TTD-compensation request were allowed after a hearing. Ampam unsuccessfully challenged this decision administratively. The Industrial Commission denied Ampam a final appeal on the issue without a hearing on November 6, 2002.
 {¶ 6} At an October 2002 appointment with Dr. Kahn, Buehler was told that his surgery was scheduled for December 2002 and that he would not be able to return to work until February 2003. But on November 11, 2002, Dr. Kahn authored a Physician's Report of Work Ability, referred to as a Medco-14, indicating that Buehler could return to work with restrictions, including a prohibition on sitting for long periods of time and lifting heavy objects. Presumably Dr. Kahn sent the Medco-14 to 3-HAB, Ampam's outside workers' compensation care coordinator. A representative from 3-HAB forwarded the Medco-14 to Rick Absher, Ampam's safety director and workers' compensation coordinator. Buehler did not receive the report. *Page 4 
 {¶ 7} Absher testified that, based upon the Medco-14, he sent Buehler a written light-duty job offer by certified mail on November 14. The offer informed Buehler that Ampam would follow all of Buehler's physicians' restrictions including the following: "no lifting over 10#s, no twisting/bending/stooping/pushing/reaching below the knee, work to be provided for sedentary work and able to move about as needed." But the offer did not include a description of the job Buehler was to perform.
 {¶ 8} Buehler was instructed to accept or reject the offer, to sign the offer form, and to return it to Absher "immediately." Absher did not apprise Buehler's attorney of the light-duty offer or the Medco-14 even though Absher understood that Buehler's attorney wanted all workers' compensation communications involving Buehler to go through him.
 {¶ 9} Buehler signed for the certified letter containing the light-duty offer, but he did not return the offer form or otherwise accept or reject the offer. On November 19, Absher asked Rhea Kimball, Ampam's human resources director, to call Buehler. Kimball was typically not involved in workers' compensation claims unless an employee was to be terminated. Kimball knew that Buehler had not been working because of a work-related injury, and that Ampam had contested the scope of Buehler's workers' compensation claim. Kimball's first attempt to reach Buehler was unsuccessful, but she left a message for him. Buehler returned her call shortly thereafter. Kimball turned on the telephone's speaker and had Absher "witness" the subsequent telephone discussion, which she summarized and documented in a contemporaneous memorandum as follows: "Rhea Kimball told him [Tim Buehler] that light duty work was available and that he could start on November 20. Tim told Rhea that his doctor and WC doctor has him off work until 2/11/03. Tim stated that he received the letter Rick Absher sent but did not [sic] sign until *Page 5 
he has reviewed it with his attorney. Rhea told him that he will have to be put on COBRA for his health care and that the company will need to get company truck back."
 {¶ 10} In a second phone conversation later that day that Absher also "witnessed," Kimball and Buehler discussed the same issues. Kimball documented the summary of this conversation as follows: "Spoke with Tim again at approximately 3:30 PM. Told Tim that information/documentation that we have states that he can return to work and work would be available November 20. Read Physician's Report of Work Ability [Medco-14] to Tim. Tim stated that he had no idea that was the case. He wanted to speak to his attorney before proceeding. Rhea again stated that work was available November 20."
 {¶ 11} Buehler did not appear for work on November 20, 21, or 22. It was undisputed that Buehler's attorney had left a voicemail message for Absher on November 20. The attorney indicated that he had not seen Dr. Kahn's Medco-14 or the job offer, and that he needed a copy of both to advise Buehler whether to accept the offer. Absher, who was out of town, had his administrative assistant fax Buehler's attorney the Medco-14 later that day.
 {¶ 12} Buehler claimed that he also left a message for Absher on November 20 relating that he was attempting to reach his attorney and that he needed more time before accepting or rejecting the job offer. Absher denied receiving this message.
 {¶ 13} Kimball terminated Buehler's employment on November 22 due to "job abandonment," referred to as "position abandonment" in the Ampam employee handbook. The handbook provided that "[p]osition abandonment occurs when an employee stops coming to work and fails to follow proper procedures for resignation or *Page 6 
absence reporting. * * * "Three (3) consecutive missed workdays, without proper notification (e.g., no-call, no-show) constitutes position abandonment."
 {¶ 14} Late in the afternoon on November 22, Dr. Kahn rescinded the light-duty return-to-work authorization on the Medco-14 because he had failed to take into consideration that Buehler could not sit for the duration of his 45-minute commute to Ampam's offices. When presented with this information after the firing, Absher and Kimball did not revoke the termination or reply to letters from Buehler's attorney challenging the termination. Ten days after the firing, Ampam moved to terminate Buehler's TTD compensation.
 {¶ 15} Ultimately, Buehler filed this lawsuit. Prior to trial, Ampam moved for summary judgment on the statutory retaliation claim and the common-law public-policy claims. Ampam argued that the undisputed facts entitled it to judgment as a matter of law on these claims. Additionally, Ampam argued that Buehler's common-law public-policy claims were not viable under Ohio law because R.C. 4123.90, the retaliation statute, provided Buehler with a sufficient remedy to adequately protect his interest as an at-will employee. The trial court refused to enter summary judgment on these claims, and after a trial, a judgment was entered against Ampam on the claims.
 Assignments of Error {¶ 16} We first address Ampam's third assignment of error. Ampam argues that Ohio does not recognize a common-law action for a termination that violates the public policy embodied in Ohio's workers' compensation laws, because R.C. 4123.90 provides a sufficient remedy for employees to protect their interests. Therefore, Ampam claims, the trial court erred in allowing the jury to consider the common-law public-policy claims. *Page 7 
 {¶ 17} Ampam acknowledges that this court has rejected its position in our prior decisions. In Boyd v. Winton Hills Med. and Health Ctr.,Inc., we held that there is a clear public policy in Ohio against retaliation for filing a workers' compensation claim.[3] Noting that the remedies provided under R.C. 4123.90 for a statutory claim of retaliatory discharge are limited and finding no intent by the legislature to make those remedies exclusive, we concluded that the legislature did not intend that R.C. 4123.90 provide the exclusive remedies for a plaintiff in a workers'-compensation retaliation case. Thus, we allowed the plaintiff, an at-will employee, to pursue a common-law claim for retaliatory discharge in violation of the public policy found in R.C. 4123.90.
 {¶ 18} In Bickers v. Western Southern Life Ins. Co., Inc.,[4] this court recently reaffirmed the holding in Boyd after reviewing various Ohio Supreme Court decisions discussing the common law of wrongful discharge. We also broadened the holding of Boyd. We recognized a common-law claim for the wrongful discharge of an at-will employee that is not "retaliatory" but is nonetheless in violation of the public policy embodied in the workers' compensation laws, as discussed by the Ohio Supreme Court in Coolidge.[5] The Coolidge-based public-policy claim stems from the premise that employers should be prohibited from terminating employees who are receiving TTD compensation, when the basis for the termination is absenteeism due to the allowed condition. Our decision in Bickers is pending on appeal before the Ohio Supreme Court.
 {¶ 19} Ampam has failed to convince us that our prior cases were wrongly decided. Thus, we follow Bickers and Boyd and continue to recognize the common- *Page 8 
law claims as viable causes of action. Accordingly, we overrule the third assignment of error.
 {¶ 20} In its first assignment of error, which we address next, Ampam challenges the trial court's denial of summary judgment on the statutory retaliation claim and the common-law retaliatory-discharge claim, because Buehler had failed to present any evidence that he was fired in retaliation for filing a workers' compensation claim. Ampam primarily cites the deposition testimony of Buehler in which he stated that he did not think that Ampam would have fired him for pursuing his workers' compensation claim.
 {¶ 21} Buehler argues that any error in the trial court's denial of summary judgment on these claims is either moot or harmless because the subsequent trial resulted in a verdict against Ampam on the same issues. In Continental Ins. Co. v. Whittington, the Ohio Supreme Court held that "[a]ny error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made."[6]
 {¶ 22} After reviewing the record, we are persuaded that the same factual issues raised in Ampam's summary-judgment motion were litigated at trial. Thus, as directed by the Whittington decision, we review the alleged error in light of the evidence presented at trial.
 R.C. 4123.90 Retaliatory-Discharge Claim *Page 9 {¶ 23} R.C. 4123.90 prohibits employers from taking punitive action against employees who file or pursue workers' compensation claims. To prove a violation of R.C. 4123.90, the employee must set forth a prima facie case of retaliatory discharge. The employee must show that (1) he was injured on the job, (2) he filed a workers' compensation claim, and (3) there was a causal connection between his filing of the workers' compensation claim and his termination.[7]
 {¶ 24} The causal connection for a R.C. 4123.90 claim requires evidence of a retaliatory state of mind of the employer. But a plaintiff is not required to present a "smoking gun" to carry his burden of offering evidence adequate to create an inference that the employment decision was retaliatory.[8] The plaintiff may satisfy his burden with any persuasive evidence of a retaliatory intent and by a direct or an indirect method of proof.[9] Thus, in the absence of sufficient direct proof, the trier of fact should consider a variety of factors in determining whether there is an inference of a retaliatory motive, including, but not limited to, the temporal proximity of the discharge to the filing of the claim, whether there was punitive action directed towards the employee after the claim was filed, whether the employer evinced a hostile attitude, and whether a legitimate reason existed for the discharge.[10]
 {¶ 25} In reviewing the length of time between the claim and the discharge, the trier of fact can consider the date the claim was filed as well as the date of significant actions involving the injured worker's pursuit of the benefits.[11] While the timing of the *Page 10 
termination can contribute to an inference of retaliation, temporal proximity alone is insufficient to support a finding of a causal connection.[12]
 {¶ 26} After a prima facie case is established, the burden then shifts to the employer to present a legitimate, nonretaliatory reason for the termination.[13] If the employer can articulate a legitimate reason, the burden then shifts back to the employee to prove that the proffered reason was a pretext, and that he was retaliated against because he sought workers' compensation benefits.[14]
 {¶ 27} At trial, Buehler established a prima facie case of retaliatory discharge. Buehler presented evidence that he was injured on the job and that he had filed and pursued a workers' compensation claim related to the injury. He also carried his burden of offering evidence adequate to create an inference that his firing was retaliatory.
 Temporal Proximity {¶ 28} To create an inference that his firing was based on retaliation, Buehler presented evidence that he was fired shortly after Ampam had learned that the Industrial Commission was allowing him to add the aggravation of preexisting degenerative conditions in his lumbar spine to his workers' compensation claim and to receive TTD compensation for this condition. Additionally, just prior to the firing, Ampam learned that Buehler was going to have back surgery related to the claim and that he would be unable to return to his previous position for months. Both Absher and Kimball testified that they knew Buehler's claim would be expensive for the company. *Page 11 
 Hostile Attitude {¶ 29} Buehler also presented evidence that a hostile attitude had emerged after Ampam learned of the significance of his claim. For instance, Absher did not initially send the light-duty offer and the Medco-14 to Buehler's attorney, although Absher acknowledged that he had been instructed to communicate through Buehler's attorney. Further, both Absher and Kimball expressed dismay when Buehler informed them that he would defer making a decision until he spoke with his attorney.
 No Legitimate Reason for the Discharge {¶ 30} Likewise, Buehler presented evidence that no legitimate reason existed for the discharge. He presented ample evidence that he was a good employee and that the three-day no-call/no-show policy was not applicable to him, or, alternatively, that he had not violated the policy.
 {¶ 31} Kimball testified that she was justified in relying on the violation of the three-day no-call/no-show policy for the termination because Buehler's physician had qualified Buehler to return to light-duty work, Buehler had received the light-duty offer, and Buehler did not call in or appear for work on November 20, 21, or 22. Kimball testified that Absher did not tell her that Buehler's attorney had called in on November 20.
 {¶ 32} But persuasive evidence at trial undermined a conclusion that the policy even applied. Kimball acknowledged at trial that she was not sure that the three-day no-call/no-show policy should have applied to someone in Buehler's situation who had been absent from work due to a workplace injury. Further, it was undisputed at trial that Buehler did not accept or reject the light-duty offer and that *Page 12 
both Kimball and Absher knew that he had not accepted or rejected the offer. Despite this knowledge, they treated Buehler's insistence on the need to seek legal advice as an acceptance of the offer. But they did not tell him of this determination or that the three-day no-call/no-show policy would apply to him.
 {¶ 33} Even if the provisions of the three-day no-call/no-show policy were triggered, there was ample evidence for the trier of fact to determine that Buehler had called in on the first day, and that he did not actually violate the policy. It was undisputed that Buehler's attorney had called in on his behalf on November 20 and informed Absher that he was unable to advise his client whether to take the light-duty offer without a copy of the Medco-14 and the job offer. His attorney asked for both documents and was faxed only the Medco-14 late in the afternoon of November 20. Kimball's testimony that she did not know about the attorney's phone call on November 20 was contradicted by Absher, who testified that he had told her about it.
 {¶ 34} Furthermore, Buehler testified that he, too, had called in on November 20.
 {¶ 35} These facts supported a finding that the three-day no-call/no-show policy was never triggered, or that even if it was triggered, Buehler did not violate the policy. It follows, then, that there was adequate support for a finding that Ampam did not have a legitimate reason for the firing.
 {¶ 36} Thus, the timing of the firing, coupled with Absher's and Kimball's antagonistic attitudes and the lack of a legitimate reason for the firing, supported an inference that Ampam had fired Buehler in retaliation for the filing and pursuit of his workers' compensation claim. *Page 13 
 {¶ 37} Ampam argues that Buehler's own admissions precluded him from establishing a prima facie case of retaliation. At trial, Buehler was cross-examined on deposition testimony in which he had indicated, "I wouldn't think that [Ampam] would fire me for [pursuing the workers' compensation claim.]" Buehler acknowledged making the statement at his deposition and explained that while he did not think he would be fired for pursuing a claim, nonetheless he had concluded that Ampam did in fact fire him in retaliation for pursuing his workers' compensation claim.
 {¶ 38} We reject Ampam's assertion that Buehler's deposition testimony prevented a prima facie showing of retaliation. The issue was whether Ampam had a retaliatory intent, not whether Buehler thought that Ampam had a retaliatory intent. Any conclusion to be drawn from Buehler's deposition testimony was for the trier of fact.
 Pretext {¶ 39} Finally, the trial record contains evidence that Ampam's reason for the firing — job abandonment — was pretextual. First, the evidence that supported a finding that Ampam did not have a legitimate reason for the firing also supported a finding of pretext. Second, Kimball's and Absher's attitudes and actions supported a finding that Ampam's reason for the firing was pretextual. For instance, during the phone conversation with Buehler on November 19, Kimball discussed with Buehler matters that related to the termination of his employment, including ending COBRA coverage and the return of a company vehicle that had been sitting in Buehler's driveway since May 2002. These facts supported an inference that at the time Kimball made the phone call, she had already decided to terminate Buehler. *Page 14 
 {¶ 40} Also, both Absher and Kimball testified that they thought it "odd" that Buehler wanted to discuss the job offer with his attorney, but both knew that his acceptance or rejection of the offer had consequences related to his TTD compensation. Kimball specifically testified that she was aware that if Buehler rejected a legitimate light-duty offer, then he would lose his TTD benefits.
 {¶ 41} Further evidence of pretext came from Ampam's refusal to entertain Beuhler's request for reinstatement after he learned that Dr. Kahn had rescinded the Medco-14 on the same date as the firing. And there was ample evidence that Kimball and Absher knew the financial impact of Buehler's claim.
 {¶ 42} Therefore, the evidence presented at trial demonstrated that there were genuine issues of material fact supporting a judgment in favor of Buehler on the statutory retaliation claim. Thus, any error in the trial court's denial of summary judgment for Ampam on this claim was moot or harmless.
 Common-Law Retaliatory-Discharge Claim {¶ 43} Likewise, the evidence at trial demonstrated that there were genuine issues of material fact supporting a judgment in favor of Buehler on the common-law retaliatory-discharge claim. To recover under the claim, Buehler was required to establish the following: (1) that a clear public policy existed and was manifested in a state or federal constitution, statute, or administrative regulation; (2) that dismissing employees under circumstances like those involved in Buehler's dismissal would jeopardize the public policy; (3) that Buehler's dismissal was motivated by conduct related to the public policy; and (4) that Ampam lacked an overriding legitimate *Page 15 
business justification for the dismissal.[15] The first two elements were questions of law for the trial court, and the last two were questions for the trier of fact.[16]
 {¶ 44} In Boyd, this court recognized that R.C. 4123.90 expresses Ohio's clear public policy against retaliation for filing workers' compensation claims.[17] If Buehler's claim were to be believed, then his firing would have jeopardized the public policy expressed in R.C.4123.90 and discussed in Boyd. Thus, Buehler met the two legal prerequisites for bringing the claim.
 {¶ 45} The two questions of fact required a determination whether Buehler was terminated for filing the claim or whether Ampam had a legitimate business justification for the firing. The same body of evidence at trial that supported Buehler's statutory retaliation claim supported his common-law retaliation claim. Thus, the evidence at trial demonstrated that there were genuine issues of material fact supporting the judgment in favor of Buehler. Where such evidence was presented at trial, any error in the trial court's denial of summary judgment on the same issues was rendered moot or harmless.[18]
 {¶ 46} Accordingly, we overrule the first assignment of error.
 {¶ 47} In its fourth assignment of error, Ampam claims that the trial court erred in instructing the jury on the Coolidge-based public-policy claim. First, Ampam makes the legal argument that the public policy discussed in Coolidge was not the public policy of Ohio at the time of Buehler's firing, because the Coolidge decision was not released until after Buehler's firing. We disagree. *Page 16 
 {¶ 48} The public policy discussed in Coolidge is embodied in sections4123.90 and 4123.56 of Ohio's Workers' Compensation Act. These statutes have been on the books for quite some time, and certainly well before Buehler's firing. Both the Coolidge and Bickers courts allowed the employees' claims to proceed even though the firings had taken place prior to the release of the Coolidge decision.[19] Likewise, we hold that the trial court did not err in allowing Buehler's claim to proceed.
 {¶ 49} Second, Ampam claims that the jury should not have been instructed on the Coolidge-based public-policy claim because there was no evidence presented at trial that Buehler was receiving TTD compensation at the time he was fired. Additionally, Ampam argues that there was no evidence presented at trial that Buehler was "discharged solely on the basis of absenteeism or inability to work when the absence or inability to work [was] directly related to an allowed condition." The essence of Ampam's argument is that, at the time of Buehler's firing, Dr. Kahn had released Buehler for light-duty work and that Buehler was not fired for his absence, but for his failure to call in.
 {¶ 50} Buehler counters by claiming that the trial record contains sufficient evidence to support the claim. Alternatively, Buehler presents an assignment of error to prevent reversal. Buehler argues that the trial court erred by forcing Buehler to relitigate the job-abandonment issue when the Industrial Commission had definitively determined that Ampam had not provided Buehler with a legitimate light-duty job offer, that Buehler had actually left a message on Absher's voicemail on November 20, and that Buehler had not abandoned his job or violated the three-day no-call/no-show policy. The Industrial Commission made these findings after Ampam had moved to terminate Buehler's TTD compensation ten days after his firing. According to Buehler, the hearings held on the *Page 17 
motion involved the same facts and issues, and these facts and issues were fully litigated between the same two parties.
 {¶ 51} Buehler made the Industrial Commission orders part of the record for summary judgment and attempted to offer them at trial in support of a directed verdict on the Coolidge-based public-policy claim. The trial court ruled that the orders were inadmissible and denied the directed verdict. Buehler proffered the orders for our review.
 {¶ 52} We decline to further address the merits of Ampam's fourth assignment of error because any error by the trial court was necessarily harmless in light of our affirmance of the judgment on Buehler's retaliation-based public-policy claim. Ampam did not request a special interrogatory to test the jury's verdict on each public-policy claim. Rather, the jury was asked, "Did Plaintiff Timothy Buehler prove by a preponderance of the evidence that his termination was in violation of public policy for the State of Ohio?" After answering yes, the jury proceeded to award damages for the violation. We cannot set aside the jury's verdict under these circumstances, even if we were inclined to find error in the trial court's submission of the Coolidge instruction to the jury.
 {¶ 53} Because we are not reversing the judgment rendered for Buehler, we do not address Buehler's assignment of error to prevent a reversal. Thus, we overrule the fourth assignment of error.
 {¶ 54} In its second assignment of error, Ampam argues that the trial court erred in denying its motion for summary judgment on theCoolidge-based public-policy claim because the evidence did not support the claim. This argument mirrors a portion of the argument raised in Ampam's fourth assignment of error. Because of our resolution of that assignment of error, this assignment of error is without merit. *Page 18 
 Conclusion {¶ 55} In conclusion, the trier of fact found that Ampam had fired Buehler in retaliation for pursuing workers' compensation benefits, and that the firing was in violation of R.C. 4123.90 and the public policy of Ohio. The evidence at trial supported a finding in favor of Buehler on these issues. Thus, we affirm the judgment of the trial court.
Judgment affirmed.
PAINTER, P. J., and HILDEBRANDT, J., concur.
[1] 100 Ohio St.3d 141, 2003-Ohio-5357, 797 N.E.2d 61.
[2] Id. at syllabus.
[3] (1999), 133 Ohio App.3d 150, 161, 727 N.E.2d 137.
[4] 1st Dist. No. C-040342, 2006-Ohio-572, discretionary appeal pending in 2006-0617.
[5] Id. at ¶¶ 11-16.
[6] 71 Ohio St.3d 150, 1994-Ohio-362, 642 N.E.2d 615, syllabus.
[7] See Wilson v. Riverside Hosp. (1985), 18 Ohio St.3d 8,479 N.E.2d 275, syllabus.
[8] Kent v. Chester Labs, Inc. (2001), 144 Ohio App.3d 587, 592,761 N.E.2d 60.
[9] See id.
[10] See id.
[11] Kelly v. Coca-Cola Bottling Co., 1st Dist. No. C-030770,2004-Ohio-3500, at ¶ 41; Doss v. Hilltop Rental Co., 1st Dist. No. C-030129, 2003-Ohio-5259, ¶ 39.
[12] See Cunningham v. Kroger Co., 1st Dist. No. C-050990,2006-Ohio-5900, at ¶ 16.
[13] See Boyd, 133 Ohio App.3d at 154.
[14] Id.
[15] See Collins v. Rizkana, 73 Ohio St.3d 65, 69-70, 1995-Ohio-135,652 N.E.2d 653; Feurer v. Ohio Heartland Community Action Comm., 3rd Dist. No. 9-06-52, 2007-Ohio-2278.
[16] Feurer, supra, at ¶ 11.
[17] See Boyd, 133 Ohio App.3d at 161.
[18] See Whittington, 71 Ohio St.3d 150, syllabus.
[19] See, also, Smith v. Children's Aid Society, 8th Dist. No. 86644,2006-Ohio-4754 (applying Coolidge retroactively.) *Page 1