OPINION
Plaintiff-appellant John Limbacher appeals from the June 15, 2001, Judgment Entry of the Tuscarawas County Court of Common Pleas granting summary judgment in favor of defendant-appellees Penn-Ohio Coal Co., dba Kimble Clay Limestone and Kimble Clay Limestone, Inc.(hereinafter referred to as "Kimble").
 STATEMENT OF THE FACTS AND CASE
Appellant John Limbacher was hired by appellee Kimble, a company engaged in the business of surface mining, in 1997. Appellant was hired to operate a machine known as a D-Mag, which is an excavator. In order to operate the machine, appellant was required to use his right foot.
On June 5, 1999, appellant injured his right foot when he "had to jump off of a small backhoe to save myself from getting crushed by a truck that was backing into the machine". Deposition Transcript of John Limbacher at 82-83. Immediately following his injury, appellant sought treatment for his injury at the hospital. Subsequently, on June 9, 1999, appellant saw his physician, Dr. Holder, who took him off of work for two weeks. On or about June 11, 1999, appellant filed a worker's compensation claim for his June 5, 1999, injury. The claim, which was certified by appellee Kimble, was subsequently allowed for the condition of "sprain, right ankle and contusion, right foot".
When appellant returned to work on June 28, 1999, he worked in the tool room which, according to appellant, was "the job they agreed to give me and that's what the doctor released me to return to". Deposition Transcript of John Limbacher at 109. When appellant was asked whether he eventually began performing other job duties, the following testimony was adduced:
 A. I was told to do those. It was made clear to me that if I did not do what they told me they made it most evidence that they was going to be as rough on me as they possibly could. Including eventually ending up firing me for it.
Q. Who told you that?
 A. That man right there, Keith Kimble, and Bob Sine.[1]
Q. And what did they tell you?
A. What I just already repeated to you.
 Q. Well, I'm asking you specifically what did they tell you?
 A. I just already repeated that to the best and I'll stand by that answer there and I'll stand by that.
Q. When did Keith Kimble tell you that?
A. Keith Kimble chewed me out two times. You know.
Deposition Transcript of John Limbacher at 109-110. According to appellant, Keith Kimble, who is appellee's Kimble's President, chewed appellant out the first time after appellant talked to him about filing a worker's compensation appeal. Appellant testified that Keith Kimble "made it most plain . . . that if I got a lawyer that he would fight me as hard as he could". Id. at 111. The second "chewing out" occurred after appellant wrote on his time card that he was not being given work within his medical restrictions and then went to see Keith Kimble about getting the tool room clerk job back. According to appellant, during such incident, Keith Kimble "just made it most plain that he did not like welfare programs, Workers' Compensation was a welfare program and that he is sick and tired of people filing for that kind of stuff . . ." Deposition Transcript of John Limbacher at 112. The following testimony was adduced when appellant was asked what else Keith Kimball had said to him during the second incident, which occurred on or about July 15, 1999,:
A. That he's going to snap me out of it.
Q. Did he use those precise words?
A. I believe he did.
Q. What did you take that to mean, snap you out of it?
 A. Either I was going to do what he wanted or he was going to fire me.
 Q. Did he ever tell you specifically he was going to fire you?
 A. By the operations of his company and by knowing the man personally and by what he actually done, he did terminate my employment then later on as he had inferred that he was going to do if I pursued the Workers' Compensation claim, yes, he did.
 Q. But I'm asking you specifically on that second instance on July 15th, 1999, did Keith threaten to fire you?
 A. Not right at that time, . . . he did not do anything that he had agreed to do in writing right from the get-go of returning to work. I mean, that is just, that is just something that never happened. He would say one thing in writing, for example, the [sic] come back to this tool work job, you know, you have work within the restrictions. This is the job that you're supposed to do. When I came back to work, that job didn't even exist at that time.
Deposition Transcript of John Limbacher at 114-115. According to appellee Kimble, appellant never complained that he was working outside of his physical restrictions.
In a "Physical Capacity Evaluation" dated October 11, 1999, Dr. Holder indicated that appellant could perform "light work", which consisted of lifting 20 lbs. max with frequent lifting/carrying of objects to 10 lbs.
Subsequently, from November 3, 1999, through November 6, 1999, appellant was absent from work. While appellant, when asked during his deposition if he had a doctor's excuse for being absent on such dates, responded that he did not know, Keith Kimble, in his affidavit,[2]
stated that appellant "gave no reason for his absence and, and he did not provide the Company with any medical or other documentation explaining his absence." Affidavit of Keith Kimble at 4. Appellant was similarly unable to recall whether he had a doctor's excuse after calling off of work November 12, 1999, through November 15, 1999. According to Keith Kimble, after appellant once again failed to provide a medical excuse for his absences, appellant "was specifically told that he was obligated to provide the Company with medical documentation that explained and excused his absences from work." Affidavit of Keith Kimble at 5.
On November 29, 1999, due to extreme pain in his right ankle, appellant asked to have the tool room job back. After his request was denied, appellant told his supervisor that he was experiencing pain and asked if he could leave work to go to the doctor's office. According to appellant, Dirk Kimble, appellant's supervisor, gave him permission to be off work until he could see another doctor. Although appellant went directly to Dr. Holder's office, Dr. Holder was unable to see appellant since he did not have an appointment.
After appellant failed to return to work on November 30, 1999, December 1, 1999, and December 2, 1999, appellee Kimble contacted Dr. Holder who, on December 3, 1999, faxed correspondence in return indicating that appellant could continue working light duty. Dr. Holder in his correspondence, stated appellant was required to have a sedentary job, was unable to stand more than 20 minutes of a time, could not lift over 15 pounds, and could not walk on uneven ground. According to Dr. Holder, "[t]hese restrictions have not changed since original recommendation." Thereafter, appellee Kimble sent a certified letter dated December 3, 1999, to appellant stating as follows:
 Due to your injury on June 6, 1999, we understand that your Doctor still indicates you are unable to perform your duties as D-Mag operator. However, as you know, we are willing to accommodate you until you are back to full capacity. Your treating physician, Dr. Holder, has indicated by the enclosed letter, that you must have sedentary job, unable to stand for more than twenty minutes (20) at a time, can not lift more than fifteen pounds (15), and no walking on uneven ground.
 We have light duty positions available for you with the stated restrictions by your doctor. The hours would be 7 am — 4:30 pm, and you would still be receiving your previous wage of $10.05 per hour. Please note that this is a temporary position which will be evaluated at various intervals as your condition improves. Our intent in offering this position is to accommodate you until you are physically able to resume to your former job duties. You are expected to report to work for this light duty position on Monday, 12-06-99.
Appellant, despite admitting to receiving the same, did not contact his employer since he was "under the impression I had to work with Workers' Compensation and I had been given permission to be off,. . . ." Deposition Transcript of John Limbacher at 171. Rather, appellant contacted the Bureau of Workers' Compensation. When Diane Crofut of the Bureau spoke with appellant on December 6, 1999, she informed appellant that he needed to contact his employer. According to Crofut, appellant "advised me he would take the parts runner position . . ." Deposition of Diane Crofut at 22. Appellee Kimble, on December 6, 1999, sent a more or less identical certified letter to appellant which stated that appellant was expected to report to work for a light duty position on December 8, 1999.
On December 8, 1999, appellant contacted Jeanie Neubecker at the Bureau of Workers' Compensation who told appellant that he needed to respond to [appellee Kimble's] offer of light duty employment and who also advised appellant that if he didn't respond, "it may look as if he abandoned his job". Deposition Transcript of Jeanie Neubecker at 18. On or about the same date, appellant sent a letter to appellee Kimble. Appellant, in his letter, which was dated December 8, 1999, stated, in relevant part, as follows:
 I am in receipt of your letter dated 12/6/99. In the same you say that you have light duty positions available, but you make no mention as to what the specifics of any position might be. As you know Dr. Holder has detailed restrictions set forth for my return to work. In order to evaluate compliance with Dr. Holder's work restrictions, I hereby request a detailed written description of any and all positions that you have available that may comply with Dr. Holders work restrictions for me.
 As you already know, you have not provided me work within Dr. Holder's restrictions before this time as you had agreed to do.
However, pursuant to a letter to appellant also dated December 8, 1999, appellee Kimble terminated appellant's employment effective December 8, 1999, stating that "[y]our absence for seven (7) days as well as your failure to contact your immediate supervisor of any problem[s] leads us to believe that you are voluntarily terminating your employment . . ."
Subsequently, on June 2, 2000, appellant filed a complaint against appellee Kimble based upon retaliation pursuant to R.C. 4123.90 as well as a common law claim for wrongful discharge in violation of public policy. Appellee Kimble later filed a motion for summary judgment to which appellant filed a response. As memorialized in a Judgment Entry filed on June 15, 2001, the trial court granted the motion for summary judgment, holding that appellant "as a matter of law, has failed to establish aClaim of retaliatory discharge under Section 4123.90, Ohio Revised Code
and both causes of action must fail as a matter of law."
It is from the trial court's June 15, 2001, Judgment Entry that appellant now appeals, raising the following assignment of error:
 THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT AGAINST APPELLANT LIMBACHER.
 STANDARD OF REVIEW
Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35,36. Civ.R. 56(C) states in pertinent part:
 Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . A summary judgment shall not be rendered unless it appears from such evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.
Pursuant to the above rule, a trial court may not enter a summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall (1997), 77 Ohio St.3d 421, 429, citing Dresher v.Burt (1966), 75 Ohio St.3d 280.
It is based upon this standard we review appellant's assignment of error.
 I
Appellant, in his sole assignment of error, argues that the trial court erred in granting appellee's motion for summary judgment on appellant's reliatory discharge claim and appellant's claim for wrongful discharge in violation of public policy. We agree.
R.C. 4123.90 prohibits an employer from taking punitive measures against an employee for filing a workers' compensation claim. An employee establishes a prima facie case for retaliatory discharge when he proves that he (1) was injured on the job, (2) filed a workers' compensation claim, and (3) was discharged in contravention of R.C. 4123.90.Kilbarger v. Anchor Hocking Glass Co. (1997), 120 Ohio App.3d 332,337-338; Wilson v. Riverside Hosp. (1985), 18 Ohio St.3d 8, at syllabus. If an employee creates a prima facie case, the burden shifts to the employer to provide a legitimate nonretaliatory explanation for the discharge. Kilbarger at 338. "[I]f the employer sets forth a legitimate, nonretaliatory reason, the burden once again shifts to the employee. The employee must then establish that the reason articulated by the employer is pretextual and that the real reason for the discharge was the employee's protected activity under the Ohio Workers' Compensation Act." Id.
In the case sub judice, there is no dispute that appellant was injured on the job on June 5, 1999, and that appellant filed a workers' compensation claim. Thus, the issue for determination is whether appellant provided the trial court with proof that he was discharged in contravention of R.C. 4123.90. "The requirement that a plaintiff show that he or she was discharged in contravention of R.C. 4123.90 may be satisfied by circumstantial as well as direct proof". Kent v. ChesterLab, Inc. (2001), 144 Ohio App.3d 587, 592.
Upon reviewing the record, we find that appellant has established aprima facie case for retaliatory discharge since appellant has produced sufficient evidence that he was fired for pursuing workers' compensation benefits. Appellant, in the affidavit attached to his response to appellee Kimble's motion for summary judgment, stated as follows:
 On or about July 20, 1999, I spoke with Keith Kimble about my desire to return to the tool room clerk position because it was consistent with my agreed upon restrictions. At that time, Keith Kimble became angry and told me that, "You are screwing us. Workers compensation costs us a lot of money, and that's money that we don't have to give you raises. I'm going to snap you out of this. If I give you work, you gotta do it."
 In early November, 1999, I was assigned to a position in a supervisor's position over temporary employees. Although my supervisors were still requiring me to perform functions that exceeded Dr. Holder's light duty restrictions, this supervisory position was somewhat less physically demanding than other positions to which I had been assigned.
 During that same period of early November, 1999, due to complications, I was experiencing with back pain, which was noted in Dr. Holder's initial claim records, I filed a claim for additional allowance with the Bureau of Workers Compensation. I filed this claim pursuant to the direct instructions of the BWC hearing officer at a prior hearing to determine my lost time claim status.
 Immediately after I filed for these additional allowances, my employer demoted me to the position of electrician's helper which was a laborer's position. This laborer's position was much more physically taxing then the supervisor's position. This physical exertion created even more problems with my injury.
In addition, during his deposition, appellant testified that Keith Kimble expressed his distaste for the workers' compensation system. According to appellant, Keith Kimble "made it plain that he did not like welfare programs, Workers' Compensation was a welfare program and that he is sick and tired of people filing for that kind of stuff . . ." Deposition Transcript of John Limbacher at 112. In short, as noted by appellant in its brief, appellant "has presented both direct and indirect evidence that Appellee Kimble demoted Appellant Limbacher, took punitive actions against him, and ultimately discharged him because he filed a workers' compensation claim".
Pursuant to Kilbarger, supra. therefore, the burden then shifted to appellee Kimble to set forth a legitimate, nonretaliatory reason for appellant's discharge. We find that appellee Kimble has satisfied its burden of articulating a legitimate, non-retaliatory motive for appellant's discharge. According to appellee Kimble, appellant was terminated due to his failure to return to work after leaving work on November 29, 1999, due to the pain in his foot.[3] Appellee Kimble produced evidence that after appellant did not immediately see a doctor or return to work, appellee Kimble made numerous attempts to contact appellant by telephone and also sent appellant two certified letters directing him to return to work by a date certain. In addition, as is set forth in detail in the statement of facts, evidence was produced that officials at the Bureau of Worker's Compensation directed appellant to contact appellee Kimble to inform it of his work status. However, appellant made no attempt to contact appellee Kimble and never returned to work as directed. Based on the foregoing, we find that appellee Kimble has offered a legitimate, nonretaliatory explanation for appellant's discharge.
The final issue for determination is whether, in accordance withKilbarger, appellant has presented evidence that appellee Kimble's alleged reason for terminating him was "pretextual and that the real reason for the discharge was the employee's protected activity under the Ohio Workers' Compensation Act." Kilbarger, supra. at 338. As appellee notes in its brief, "the same evidence that establishes Appellant Limbacher's prima facie case is applicable to establish pretext."
Viewing the evidence in a light most favorable to appellant, we conclude that appellant has sufficiently rebutted appellee Kimble's nonretaliatory justification for his discharge. We find that Keith Kimble's negative comments to appellant regarding the Workers' Compensation system, appellee Kimble's alleged demotion of appellant to a more physical strenuous position immediately after appellant filed a claim for an additional allowance, the timing of the letters sent to appellant on December 3 and December 6, 1999[4], and the fact that appellant, during his deposition, testified that he believed that he had permission to be off work until he saw his doctor, all create a genuine issue of material fact as to whether appellee Kimble's stated reason for discharging appellant was pretextual.
Based on the foregoing, we find that the trial court erred in granting appellee Kimble's motion for summary judgment as to appellant's claim alleging retaliation pursuant to R.C. 4123.90 since there are genuine issues of material fact with respect to whether appellee Kimble acted in a retaliatory manner, and whether appellant was, in fact, discharged for filing a workers' compensation claim.
As is stated above, the trial court also granted summary judgment on appellant's claim that appellee Kimble violated Ohio public policy by firing appellant for filing a workers' compensation claim. In Boyd v.Winton Hills Medical Health Center, Inc. (1999), 133 Ohio App.3d 150,
the court, relying on Kulch v. Cultural Fibers, Inc. (1997),78 Ohio St.3d 134, held that "Ohio law allows common-law wrongful-discharge claims for violations of R.C. 4123.90." Boyd,supra, at 161. Such common-law causes of action include a cause of action for termination in violation of public policy. Id. at 159-161. A common-law wrongful-discharge claim allows remedies that are not included under R.C. 4123.90, such as punitive damages, and also confers upon the plaintiff a right to a jury trial. Id. at 161.
Based upon our above discussion of appellant's statutory claim, we find that appellant's public-policy claim remains viable and that the trial court erred in granting summary judgment on such claim. See Kent,supra.
Appellant's first assignment of error is, therefore, sustained.
Accordingly, the judgment of the Tuscarawas County Court of Common Pleas is reversed and this matter is remanded to the trial court for further proceedings.
By EDWARDS, J. WISE, P.J. and BOGGINS, J. concurs
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas is reversed and remanded for further proceedings. Costs to appellees.
[1] Robert Sine is appellee Kimble's Human Resource Manager.
[2] The affidavit of Keith Kimble is attached to appellee Kimble's Motion for Summary Judgment.
[3] Appellee, in its brief, indicates that if appellee Kimble's reason for terminating appellant due to his failure to return to work was believed, "that would arguably provide a legitimate reason for termination."
[4] Appellee sent a letter to appellant on December 3, 1999, indicating to appellant that he was expected to be at work on Monday, December 6, 1999. A similar letter was sent to appellant on December 6, 1999, indicating appellant was expected to work on December 8, 1999. These two letters were followed by a December 8, 1999, letter which indicated that appellee believed appellant had voluntarily terminated his employment.