OPINION.
{¶ 1} The plaintiff-appellant, Phillip Kelly, appeals from the order of the trial court granting summary judgment to the defendant-appellee, Coca-Cola Bottling Company, on his cause of action for retaliatory discharge under R.C. 4123.90. According to Kelly, his employment with the company was terminated in retaliation for his successful filing of a workers' compensation claim for an occupational back injury, and the termination was occasioned directly by a re-injury that occurred after the company had interceded with his physician to cause his return to work. According to Coca-Cola, Kelly was terminated for "dishonesty" when a surveillance tape showed him in a gym lifting weights in excess of the limitations placed upon him by his physician following surgery.
 {¶ 2} In his single assignment of error, Kelly argues that the trial court erred by granting summary judgment because (1) the trial court failed to review Kelly's deposition, which had been submitted prior to the court's entry of summary judgment, and (2) the evidence of record, including the overlooked deposition, created a genuine issue of material fact concerning whether his termination for "dishonesty" was merely a pretext. For the following reasons, we reverse and remand
 BACKGROUND {¶ 3} Coca-Cola employed Kelly in 1998 as a "flex merchandiser." The position required that he move the company's product (i.e., bottled soft drinks) from a storeroom at a grocery store or other location and load it onto store shelves. The product was transported on pallets weighing over 1,200 pounds. On July 24, 2000, Kelly claimed that he was injured at a Biggs store in the Western Hills suburb of Cincinnati when the pallet jack got caught on a ramp, jerking his back. Pursuant to company procedures, Kelly was placed on lighter duty until he exhausted the allotted 60 days, and then he took medical leave. He filed a claim for workers' compensation benefits on August 16, 2000. According to his deposition testimony, "Right from the onset, [Coca-Cola] gave me a hard time about filing the Workmen's [sic] Comp, they didn't believe that I was hurt, even after I give [sic] them a written notice of where I was hurt, how I was hurt, the time I did it, they didn't believe I was hurt there. And I had to fight tooth and nail to get the Workers' Comp under way."
 {¶ 4} Although Coca-Cola contested the claim, Kelly was ultimately awarded workers' compensation benefits. Meanwhile, still on leave, Kelly underwent back surgery on December 13, 2000, to repair a herniated disc. Afterward, he was referred to Dr. Jesse Portugal, a specialist in physical medicine and rehabilitation, and he began physical therapy with a therapist, Jacqueline Christine. In accordance with company procedures, he returned to Coca-Cola in April 2001, working in a restricted-duty position for 60 days. His duties during this period, which involved store displays, did not exceed any physical limitations placed upon him by his doctor.
 {¶ 5} Following the 60-day period of restricted duty, Kelly believed that he still could not resume his former duties as a flex merchandiser. Consequently, he returned to leave status around June 2001 and once again began to collect workers' compensation benefits. While on leave, he resumed a program of physical therapy that he had begun earlier in the year (between January and March) with Christine. The earlier therapy had employed an exercise bike, stretching, aerobic exercises, and resistance exercises on machines using rubber bands and cables. He testified that, after returning to leave status, he and Christine agreed that, rather than use up the remainder of his covered physical therapy sessions, he would begin a self-conducted workout program in the gym. He stated that he went to the gym at least once a week, and that, to his best recollection, he informed Dr. Portugal of his workout program.
 {¶ 6} Kelly was seen by Dr. Portugal on July 31, 2001. Dr. Portugal described Kelly's problem as follows: "History of neck and back pain and endurance impairment. History of cervical fusion with C8 corpectomy and C6-C7 disectomy with use of Parnage cage and excision of extraforaminal disc left L4-L5." The doctor's impression was "Impaired endurance. Strength has improved. * * * He needs to continue work with conditioning aspects. By his description of what is required of him at his regular duty, I do not feel that he would be able to perform this as he states they require `speed' in terms of the lifting of the case that he is to transport. The lateral requirement would have been perfect for him. He isof medium level duty with no lifting greater than 35-40 pounds andfrequent carrying at 25 pounds." (Emphasis supplied.)
 {¶ 7} Kelly testified that Christine told him to incorporate weight lifting into his gym workout, which he did. On August 9, 2001, Coca-Cola conducted surveillance of Kelly's gym workout and videotaped him performing prescribed therapeutic stretching exercises and jogging on a treadmill. The company also taped Kelly using various weight machines. While exercising on a lateral pull-down machine, Kelly was taped using forty pounds of weighted resistance on the cable.[1] Kelly did not deny his use of the particular weight but testified that he only used that much resistance on the lateral pull-down machine, not on the others, and that his use of the weight was the result of his not having been in the gym for a while and a desire to see "how much I had fallen off." He conceded that use of the 40 pounds went beyond the physical limitations imposed by Dr. Portugal in his July 31, 2001, report, but he also stated that he was never sure of the weight limitations "because it changed every time I visited with him." He testified that that he thought at one point that Dr. Portugal had given him a maximum weight of 50 pounds.
 {¶ 8} Coca-Cola brought the videotape to the attention of Dr. Portugal. On August 20, 2001, Dr. Portugal dictated a chart note regarding Kelly's condition. He stated that he had begun seeing Kelly after his surgery and that Kelly had been "on restricted duty based on concerns regarding his endurance and ability to perform repetitive movements." Dr. Portugal next stated, "The tape showed [Kelly] capable of performing a greater than 200 [sic][2] pounds wide-gripped pull downs [sic], several repetitions. He was also shown jogging easily and comfortably for 13 to 14 minutes straight."
 {¶ 9} Dr. Portugal then noted that a clinical examination of Kelly showed "agross normal strength and a normal neurological presentation." He observed that Kelly's post-surgery physical therapy was to focus on "postural mechanics and improving his endurance." Although Kelly had apparently called the office and reported that his legs were still weak, Dr. Portugal stated that he had "never seen a patient with `weak legs' able to jog 14 minutes on a treadmill straight." Patients with weak legs, Dr. Portugal noted, "are usually struggling to walk perhaps five minutes at a time." He then added, "If [Kelly] watches his body mechanics, as many patient[s] before have done, he should be able to perform his duties without injury. However, his cryptic comments to me indicate that he does have an agenda and may prove this to be a self-fulfilling prophecy. Time will tell."
 {¶ 10} Dr. Portugal concluded the chart note by stating that it was safe to move Kelly "back to his work place based on findings of his functional capability shown on video as well as his presentation on several visits with me in this clinic."
 {¶ 11} Kelly testified that Coca-Cola called him to inform him that Dr. Portugal had released him to return to work. He indicated that he had a contemporaneous conversation with Dr. Portugal, asking his doctor whether he knew the particulars of his job duties as a flex merchandiser, and that when he explained to him what those were, Dr. Portugal agreed that such duties would be too stressful. Nonetheless, Kelly was sent a copy of the release and reported back to Coca-Cola on August 21, 2001.
 {¶ 12} Either the first or second day back at work, Kelly claimed to have aggravated his back injury. According to Kelly, the company doctor diagnosed him with a "lumbar strain reoccurrence." Kelly was again seen by Dr. Portugal. In a chart note dated August 23, Dr. Portugal stated that Kelly reported injuring himself while rotating his trunk in order to stack store displays. According to Dr. Portugal, Kelly stated that such trunk rotation was necessary to the speed required for his job and was unavoidable despite the doctor's precautions and advice on postural mechanics. Dr. Portugal stated, "I warned him that continuing to perform maneuvers that put himself at risk is counterproductive. He states that's what is required of him in the work place."
 {¶ 13} Dr. Portugal's impression was "muscle strain" and "aggravation of low back pain." He stated that he advised Kelly to perform the "job correctly from a biomechanical standpoint," and that, if he could not perform the job fast enough, he should request the company to view his work maneuvers. According to Dr. Portugal, Kelly told him that the company would "never do that." Dr. Portugal stated that Kelly's comment caused him to recall that his own request of Coca-Cola that it provide "on-site evaluation and transitional work" for Kelly had been denied. Dr Portugal concluded, "I spoke with [Kelly] and told him he and Coca-Cola need to get together on this issue. He has a physical capability of doing his job but must do correct body mechanics. He states they will not allow that as speed is of the essence. I stated he must make a choice of what he needs to do in order to protect himself from further pain."
 {¶ 14} Dr. Portugal recommended that Kelly remain off work until Monday, August 27, 2001. He prescribed medication for muscle spasm and stated that Kelly was able to return to work "but no repetitive twisting or rotating," and that he should be allowed "two to three stops for the first week." Dr. Portugal also strongly recommended on-site evaluation with Kelly.
 {¶ 15} On September 6, 2001, after returning to restricted work, Kelly was informed that Coca-Cola was considering firing him. Also on the same date, Kelly was seen by Dr. Portugal. In a letter summarizing that visit, Dr. Portugal stated that he had not placed Kelly on light duty and had imposed no weight restrictions on his return to work, instructing him only to "watch proper postural mechanics during the course of his work and no repetitive twisting and rotation of the trunk, which had aggravated his pain previously." Dr. Portugal's final impression was as follows: "Neurologically stable at this time. There are work issues going between Coke and this employee that are beyond my control as had been discussed with [the] Occupational Health Nurse at Coca-Cola, as well as Mr. Kelly. His only `restrictions' are that he watch his body mechanics and do regular rotation and twisting. Beth, at Coca-Cola, told me that they will be bringing in a physical therapist to speak on proper body mechanics to the workers there. I have recommended that if as Mr. Kelly charges that he has to engage in body mechanic maneuvers because speed is required on the job, then a supervisor or representative such as a physical therapist, appointed by Coca-Cola, should go out with hi[m] to the work place."
 {¶ 16} By letter dated September 28, 2001, Tina Keinsley, the company's human relations manager, informed Kelly that his employment had been terminated. Keinsley noted that although Kelly maintained that his exercises on the videotape were within Dr. Portugal's restrictions, the company had received a note from the doctor stating that they were not. Keinsley stated that numerous attempts had been made by the company to talk to Christine, Kelly's physical therapist, but that "she has been unwilling to talk to us." Although Keinsley did not specifically state the grounds upon which Kelly was fired, in this appeal Coca-Cola has taken the position that Kelly's employment was terminated for "dishonesty because he engaged in prohibited physical activity while on leave from Coca-Cola to recover from an alleged workplace injury." Despite terminating Kelly for what it believed to be just cause, the company fully paid his workers' compensation claim.
 THE TRIAL COURT'S DUTY TO READ {¶ 17} In his first issue presented for review, Kelly argues that the grant of summary judgment must be reversed on a narrow, but dispositive, procedural ground — that the trial court failed to consider his deposition with attached exhibits that had been filed with the court at the time it rendered its judgment. We agree.
 {¶ 18} Kelly's deposition was taken on March 18, 2003. In its motion for summary judgment, Coca-Cola cited repeatedly (by our count, a total of 51 times) to the transcript of Kelly's deposition for both its statement of "undisputed facts" and legal argument. The company's motion did not contain any other evidentiary material.[3]
 {¶ 19} A hearing on the motion was held on September 19, 2003. At the time of the hearing, apparently by oversight, Coca-Cola had not filed Kelly's deposition with the court. Counsel for Coca-Cola admitted its unintended omission, stating, "I don't have an excuse, frankly, for not filing the deposition transcript." In closing argument, counsel for Kelly reminded the court that the ultimate issue was whether Kelly had been "dishonest" as the company claimed, and the court actually asked counsel "out of curiosity" whether Kelly had done well during his deposition to explain his use of greater weight than that recommended by Dr. Portugal. At the end of the hearing, the court took the matter under advisement and granted counsel for Coca-Cola a week to submit the missing deposition before it rendered its decision.
 {¶ 20} Coca-Cola filed Kelly's deposition along with 11 attached exhibits on September 23, 2003, well within the one-week period of leave. In its entry granting summary judgment on September 29, however, the trial court was clearly under the erroneous impression that the deposition had not been filed. Before beginning its legal analysis, the court stated, "Although defendant's attorney represented to the Court he would file plaintiff's deposition within a week, that deposition has not been filed of record when this decision was dictated on September 29, 2003."
 {¶ 21} As this court has previously noted, "Civ.R. 56(C) imposes anabsolute duty upon a trial court to read and consider all pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact when ruling on a motion for summary judgment." See Moravec v. Hobeika (Mar. 17, 2000), 1st Dist. No. C-990622 (emphasis supplied). Although Coca-Cola does not (and cannot) dispute that the trial court did not satisfy this "absolute duty," the company urges that we treat the omission as harmless error because of what the company views as the admission by Kelly's trial counsel that his client had lifted more than 40 pounds on the videotape.[4] According to Coca-Cola, this acknowledgment constituted an "in judicio" admission by counsel that his client had acted dishonestly toward the company and therefore obviated any necessity that the court actually read Kelly's deposition.
 {¶ 22} As Kelly points out, however, there were no stipulations before the trial court filed under Civ.R. 56(C). Even if there were, however, the duty of the trial court to read Kelly's deposition was no less "absolute." As for the statements of Kelly's counsel before the court, such statements were not evidence for the purposes of Civ.R. 56(C). Again, however, even if they were, counsel's statements were far from an admission that his client had acted "dishonestly" toward the company, or even toward Dr. Portugal, and still would not have excused the court's failure to read the deposition itself.
 {¶ 23} Coca-Cola also argues that the trial court was not obligated to read the Kelly deposition because Kelly did not cite or otherwise refer to the deposition in his memorandum in opposition to the company's motion for summary judgment. Again, however, we find this argument beside the point. The company cited to Kelly's deposition 51 times in its motion for summary judgment. When filed by Coca-Cola, the deposition also had attached 11 highly pertinent exhibits, including the reports of Dr. Portugal. (Most of our summary of the facts in this case derives from Kelly's deposition and attached exhibits.) Once the deposition was filed within the period of leave granted following the hearing on the motion, the trial court, simply put, had to read it. The fact that the court was unaware of its presence was no excuse.
 {¶ 24} Still attempting to make an absolute duty less than absolute, Coca-Cola argues that Kelly waived any error by the trial court in failing to read the deposition by not objecting. The error, however, did not appear until judgment was entered, and since the judgment was a final order, Kelly had a right to an immediate appeal under R.C. 2505.02.
 {¶ 25} Finally, Coca-Cola argues that because our review of an entry granting summary judgment is de novo, the trial court's error can simply be overlooked in light of our own independent review of the record. This argument fails in light of Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 604 N.E.2d 138, in which the Ohio Supreme Court expressly rejected the notion that independent consideration by an appeals court "could, in effect, cure the trial court's failure to examine the evidence." Id. at 360, 604 N.E.2d 138. The court observed that the requirements of Civ.R. 56(C) were to be strictly enforced and that "the trial court's function cannot be replaced by an `independent' review of an appellate court." In sum, the failure of the trial court to consider all appropriate materials under Civ.R. 56(C) constituted incurable reversible error. Id.; see, also, Moravec, supra.
 GENUINE ISSUES PRECLUDING JUDGMENT {¶ 26} In his second issue presented for review, Kelly argues that the record presented to the trial court created genuine issues of material fact precluding summary judgment. Specifically, he argues that he presented sufficient evidence to raise a triable issue concerning whether the company's stated reason for terminating him — dishonesty — was merely a pretext. We agree.
 {¶ 27} As this court stated in Boyd v. Winton Hills Medical and HealthCenter, Inc. (1999), 133 Ohio App.3d 150, 154, 727 N.E.2d 137, quotingWilson v. Riverside Hosp. (1985), 18 Ohio St.3d 8, 479 N.E.2d 275, syllabus, "[t]o prove a violation of R.C. 4123.90, the employee must set forth a prima facie case of retaliatory discharge. The employee must show that he or she was `injured on the job, filed a claim for workers' compensation, and was discharged by the employer in contravention of R.C. 4123.90.' If the employee establishes a prima facie case, then the employer must set forth a legitimate nonretaliatory reason for the discharge. Finally, if the employer provides a nonretaliatory reason for the discharge, the employee must prove that the reason was pretextual."
 {¶ 28} Both before the trial court and on appeal, Kelly and Coca-Cola have agreed that Kelly satisfied the two requirements for establishing a prima facie case of retaliatory discharge, and that the critical issue was whether Kelly presented sufficient evidence to create a triable issue concerning whether he was discharged in contravention of R.C. 4123.90.
1. Coca-Cola's Initial Burden As the Moving Party
 {¶ 29} As the party seeking summary judgment, it was incumbent upon Coca-Cola to inform the court of the basis of its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and other materials enumerated in Civ.R. 56(C) that it believed demonstrated the absence of a genuine issue of material fact.Celotex Corp. v. Catrett (1986), 477 U.S. 317, 106 S.Ct. 2548: Mitseff v.Wheeler (1988), 38 Ohio St.3d 112, 114-115, 526 N.E.2d 798. Coca-Cola was not required to present any affirmative evidence to negate Kelly's claim, but it was required to point to "those portions of the record" demonstrating that Kelly had not created an issue of fact precluding judgment in the company's favor as a matter of law. Dresher v. Burt,75 Ohio St.3d 280, 292, 1996-Ohio-167, 662 N.E.2d 264.
 {¶ 30} Coca-Cola argued in its motion that Kelly had failed to present any evidence that his termination was the result of his filing of a workers' compensation claim, and that the company had presented a legitimate reason for his termination, "namely, that he violated his doctor's orders concerning treatment for the injury he allegedly suffered while working for Coca-Cola." According to Coca-Cola, Kelly's claim was based "solely on a `feeling' he got when he was around other Coca-Cola employees after he filed his workers' compensation claim."
 {¶ 31} Significantly, however, at the time Coca-Cola filed its motion, the only materials of record were the complaint and the answer. As noted, the company, though citing repeatedly to its pages, had yet to submit the deposition of Kelly, and it never did produce the videotape, either before or after the hearing on the summary-judgment motion. Furthermore, no discovery had yet been filed with the court. (Kelly's answers to Coca-Cola's interrogatories would only be filed later as an exhibit attached to Kelly's deposition.) In sum, Coca-Cola's motion at the time of its filing was based upon nothing more than its unsupported conclusions in its memorandum. As the Ohio Supreme Court made clear inDresher, although the moving party is not required to submit affirmative evidence to negate the non-moving party's claim, the moving party still has the burden of identifying the "portions of the record" that demonstrate the absence of a genuine issue of material fact. "[P]ortions of the record" means only those evidentiary materials listed in Civ.R. 56(C). Id. at 296, 662 N.E.2d 264. Where no evidentiary materials have been filed by either party to constitute a record under Civ.R. 56(C), and the moving party relies only upon unsupported conclusions in its memorandum in support of the motion, the moving party has not satisfied its initial burden. Id.
2. Kelly's Response to the Motion
 {¶ 32} Only if Coca-Cola had satisfied its burden under Celotex,Mitseff, and Drescher, would Kelly have been under a reciprocal burden to set forth specific facts showing that there was a genuine issue for trial. Dresher, supra, at 293, 662 N.E.2d 264. As stated in Civ.R. 56(E), only when a motion for summary judgment "is made and supported as provided in this rule" is a party not allowed to rest on the pleadings but must, rather, set forth specific facts showing there is a genuine issue for trial. As Coca-Cola's motion was filed absent any evidentiary materials under Civ.R. 56(C) but for the complaint and the answer, Kelly was technically under no such burden. Nonetheless, Kelly filed a memorandum in opposition that attached both his affidavit and that of Tawnya McMahan, who was formerly employed as an Occupational Health Nurse at Coca-Cola. McMahan's affidavit stated that in January of 1999 she was "actively involved in discussions and decisions about employees receiving workers' compensation benefits," and that it was the company's policy "to terminate employees when they had been off of work and receiving workers' compensation benefits for two years." McMahan further commented that the company's practice was to investigate and closely monitor such employees and to review the employees' files "to see if anything in [them] could be used to justify a termination." According to McMahan, Peggy Lamers, the claims manager for the company's third-party administrator, Hunter Consulting, would refer to certain employees whom she believed to be malingering as "pieces of shit."
3. Coca-Cola's Reply
 {¶ 33} Coca-Cola filed a memorandum in response to Kelly's materials. In it, the company continued to refer to Kelly's deposition and insisted that he had presented "no evidence to dispel the contention that [Coca-Cola] had terminated him for dishonesty." Furthermore, the company raised a new argument — that while Kelly had been terminated for his "original fraudulent behavior of violating his doctor's orders and lifting weight in excess of the limitation imposed by his doctor," Kelly had also "continued his dishonest behavior after the August 21, 2001, injury by telling his doctor that he was on `light duty' when he returned to work." According to the company, this was untrue because Dr. Portugal "never placed Kelly on light duty." To support this claim of a second instance of dishonesty, the company attached Dr. Portugal's chart notes of August 23, 2001, and September 6, 2001. The company also attached Kelly's request for temporary total compensation filed with the Bureau of Workers' Compensation on April 5, 2002, as well as documents concerning the denial of that claim by the industrial commission.
 {¶ 34} Coca-Cola later supplemented its reply by filing an entry granting summary judgment in a suit brought against it by McMahan on a claim of failure to provide a safe workplace. According to the company, the previous litigation showed that McMahan was a "disgruntled former employee," and that if the court were to "consider the hearsay statements of Mrs. McMahan, her legal status is also worth considering."
4. The Hearing on the Motion
 {¶ 35} As we have discussed, the trial court conducted a hearing on the motion on September 19, 2003. During the hearing the court expressed its concern for two items missing from the record. The first was the still unfiled deposition of Kelly, which we have already discussed at length. The second was the videotape. The court clearly wished to have the videotape before it, asking why it was not filed and stating that, without the tape, it had "absolutely no idea" what weight Kelly had been caught lifting. Counsel for Coca-Cola stated that he could not answer why the videotape was not in evidence. When the court commented that the amount that Kelly was shown to have been lifting was "very material," counsel indicated that he was "not certain" if the tape would "show exactly that." As noted, Coca-Cola would later file Kelly's deposition with attached exhibits, but, curiously, not the videotape.
5. The Trial Court's Ruling
 {¶ 36} As we have discussed, the trial court was unaware that Kelly's deposition was later filed, pursuant to leave granted at the hearing, and therefore never considered it. In its entry granting summary judgment, however, the court stated that it would "resolve" the issue of whether Kelly's termination for dishonesty was pretextual or retaliatory. The court stated that, based only upon the pieces of evidence it thought it had before it, there was "NO" evidence of a retaliatory dismissal.
6. The Merits of the Motion
 {¶ 37} As this court has noted, a claim of retaliatory discharge under R.C. 4123.90 does not require the plaintiff "to present a `smoking gun' in order to withstand summary judgment * * *." Kent v. Chester Labs,Inc. (2001), 144 Ohio App.3d 587, 592, 761 N.E.2d 60. The plaintiff's burden may be satisfied by either circumstantial or direct proof. Id. "The factors that a trier of fact may consider in determining whether there was a retaliation include `punitive action such as bad performance reports after the * * * claim was filed, the length of time between the claim and the discharge, changes in salary level, hostile attitudes emerging, and whether legitimate reasons exist for the discharge.'"Boyd, supra, at 152, 727 N.E.2d 137, quoting Anschutz v. Dresser Indus.,Inc. (Dec. 11, 1991), 3rd Dist. No. 3-90-8.
 {¶ 38} Based upon our independent review of the record, which includes Kelly's deposition and attached affidavits, and giving Kelly the benefit of all reasonable inferences as required by Civ.R. 56(C), we hold that genuine issues remain for trial. As noted in our questioning during oral argument, we have yet to be convinced that the fact Kelly may have exceeded the physical limitations placed upon him by Dr. Portugal on one exercise using a lateral pull-down machine somehow constituted an act of dishonesty toward Coca-Cola, as opposed to, simply, poor judgment in following his doctor's orders. Nowhere in the record do we find any evidence that Kelly ever told anyone — the company or Dr. Portugal — that he was physically incapable of lifting greater than thirty-five pounds while exercising on a lateral pull-down machine. According to his deposition, he was never exactly clear what weight limitations were placed upon him by Dr. Portugal, which, if true, means that he could hardly be accused of anything even remotely approaching dishonesty. As for the claim that Kelly was subsequently dishonest by telling someone at Coca-Cola that Dr. Portugal had placed him on light duty, the facts of this alleged misrepresentation are far from clear in the record, and, perhaps more importantly, this instance of alleged dishonesty was not even raised in Keinsley's letter of termination and appears to have surfaced during the course of this litigation.
 {¶ 39} As for Kelly's alleged dishonesty in lifting too much weight, the record as it presently stands creates an issue of fact regarding what weight Kelly was actually caught lifting. During his deposition, Kelly was only asked about 40 pounds of weight — a mere five pounds over that recommended by Dr. Portugal and hardly evidence that he was deliberately concealing a vast untapped reservoir of strength. For some unexplained reason, however, Dr. Portugal in his August 20, 2001, chart note stated that Kelly was caught on tape doing several repetitions of not 40 but 200 pounds, or five times that discussed during his deposition. How did Dr. Portugal, one wonders, arrive at such a figure? And if, as counsel for Coca-Cola represented to the trial court, the tape, which was never introduced, was unclear as to the amount of weight Kelly was actually lifting, how was it possible for the company to determine that he was lifting even 40 pounds? As noted by the trial court, the tape was a "very material" item of evidence in this case — the company's "smoking gun" as it were, and its absence from the record raises numerous important factual questions.
 {¶ 40} Kelly also presented evidence of "hostile attitudes emerging" after he was injured on the job. In his deposition, he described the company giving him a "hard time" and his having to fight "tooth and nail" to begin the process of filing a workers' compensation claim. Additionally, McMahan stated in her deposition that she was privy to a company policy of reviewing the files of employees who had been receiving workers' compensation for a period of two years or more in order to find a reason to justify their termination. Although the trial court sought to dismiss McMahan's affidavit as self-serving in light of her own previous lawsuit against the company, the trial court was not permitted to assess McMahan's credibility as a basis for granting summary judgment. McMahan's affidavit clearly supported Kelly's claim that his firing was pretextual. As for Coca-Cola's argument that the affidavit was impermissible "hearsay," Civ. R. 56(E) permits affidavits based upon personal knowledge. The only arguable hearsay aspect of her affidavit was the quotation attributed to Lamers, but even that quotation would not have been considered hearsay if it was deemed an admission of a party-opponent under Evid.R. 801(D)(2).
 {¶ 41} Finally, Kelly argues cogently that the timing of his dismissal supported at least a reasonable inference that dishonesty was not the real reason that he was fired. As he points out, the company's first reaction to the videotape was not to terminate his employment, but to cause him to return to work. As a matter of timing, it was only after he had returned to work and apparently re-injured himself that the company then informed him that he was being fired for the same act of alleged dishonesty. Although Coca-Cola responded during oral argument that the delay in firing Kelly was due to the time it took to review the matter internally, we can find no specific evidence of this in the record, and even if it did exist, such evidence would only have created a triable issue.
7. Conclusion
 {¶ 42} In sum, we hold that record before the trial court demonstrated a genuine issue of material fact whether Coca-Cola's stated reason for firing Kelly — "dishonesty" — was pretextual. There are clearly questions regarding what degree of dishonesty toward the company, if any, Kelly engaged in by using 40 pounds or more of resistance on one weight machine during his self-managed physical therapy program; the contents of the videotape that led to his firing; Dr. Portugal's assumptions regarding what the tape showed; company policy regarding employees off work and receiving workers' compensation; the timing and impetus for Kelly's firing; and, perhaps ultimately, Kelly's actual physical capacity to resume his former duties as a flex merchandiser and whether he ever did anything to misrepresent that capacity to the company.
 {¶ 43} Kelly's assignment of error is sustained. Accordingly, the judgment of the trial court is reversed, and this case is remanded for further proceedings in accordance with law.
Judgment reversed and cause remanded.
Winkler, P.J., and Doan, J., concur.
[1] There is a discrepancy in the record about what weight exactly Kelly was using for the lateral pull-downs. In his deposition, the only amount of weight discussed was forty pounds, which strikes us as less than Herculean. In his August 20 chart note, however, Dr. Portugal indicated that Kelly was taped doing repetitions using 200 pounds of weight. This discrepancy was not explained. As we discuss later in the text, the videotape was never made part of the record, thus prohibiting us from independently examining the tape itself.
[2] See n. 1.
[3] As we discuss later, Coca-Cola did eventually submit certain materials in response to Kelly's memorandum in opposition to its summary-judgment motion. Those materials are not pertinent to our discussion here.
[4] For its proposition that a trial court's failure to read a deposition filed under Civ.R. 56(C) may be considered harmless error, Coca-Cola cites only one case, Weiper v. W.A. Hill Assoc. (1995),104 Ohio App.3d 250, 661 N.E.2d 796. Weiper, however, did not involve any such issue.